```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4             v.                        13 Cr. 582 (RPP)

5  ANDRE CALIX,

6                  Defendant.

7  ------------------------------x

8
                                       February 10, 2014
9                                      2:10 p.m.

10
   Before:
11
                   HON. ROBERT P. PATTERSON, JR.,
12
                                       District Judge
13

14                        APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    BY:  RICHARD A. COOPER
17       JOHN O'DONNELL
         Assistant United States Attorneys
18
    FEDERAL DEFENDERS OF NEW YORK, INC.
19      Attorneys for Defendant
    BY:  SARAH J. BAUMGARTEL
20

21

22

23

24

25
```

1          (Case called)

2          THE DEPUTY CLERK:  Is the government ready in this

3    matter?

4          MR. COOPER:  Good afternoon, your Honor.  Richard

5    Cooper and John O'Donnell for the government.

6          THE COURT:  Good afternoon, Mr. Cooper, and good

7    afternoon, Mr. O'Donnell.

8          THE DEPUTY CLERK:  Is the defendant ready in this

9    matter?

10          MS. BAUMGARTEL:  Yes.  Good afternoon.  Sarah

11    Baumgartel, Federal Defenders, for Mr. Calix.

12          THE COURT:  Good afternoon, Ms. Baumgartel.  Good

13    afternoon, Mr. Calix.

14          THE DEFENDANT:  Good afternoon.

15          THE COURT:  We don't need an interpreter?

16          MS. BAUMGARTEL:  That's correct.

17          THE COURT:  We are all ready for the suppression

18    hearing?

19          MR. COOPER:  Yes, your Honor.

20          THE COURT:  Is there something else that comes before

21    it?

22          MR. COOPER:  Not from the government.

23          MS. BAUMGARTEL:  We are ready to proceed with the

24    hearing, your Honor.

25          THE COURT:  Okay.  Then call your first witness.

1          MR. COOPER:  Thank you, your Honor.  The government

2     calls Special Agent Jason Floyd.

3      JASON FLOYD,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6          MR. COOPER:  May I proceed?

7          THE COURT:  Yes, sir.

8     DIRECT EXAMINATION

9     BY MR. COOPER:

10    Q.  Where are you employed?

11    A.  I work for the FBI.

12    Q.  And what is your position there?

13    A.  I am a special agent.

14    Q.  How long have you been a special agent at the FBI?

15    A.  Approximately five years.

16    Q.  What is your current assignment?

17    A.  I work on the violent crime squad.

18    Q.  Prior to joining the FBI, where did you work?

19    A.  I worked for the Northglenn Police Department in

20    Northglenn, Colorado.

21    Q.  What was your position there?

22    A.  Police officer.

23    Q.  How long were you a police officer in Northglenn, Colorado?

24    A.  Seven years.

25    Q.  What are your responsibilities as a special agent on the

1   violent crime squad?

2   A.  We investigate a myriad of crimes to include bank robbery.

3   Q.  Agent Floyd, in your law enforcement career approximately

4   how many searches of residences have you conducted?

5   A.  Hundreds.

6   Q.  And approximately how many times have you interviewed

7   individuals after arrest?

8   A.  Hundreds.

9   Q.  Directing your attention to July 18th, 2013, were you

10  involved in an arrest that day?

11  A.  Yes, I was.

12  Q.  Who did you arrest?

13  A.  Andre Calix.

14  Q.  Did you have an arrest warrant for Mr. Calix?

15  A.  Yes.

16  Q.  What were the charges?

17  A.  Bank robbery.

18  Q.  Approximately how many bank robberies was Mr. Calix charged

19  with at that point?

20  A.  Three.

21  Q.  Did any of those bank robberies involve a dye pack?

22  A.  Yes, they did.

23  Q.  What color dye pack?

24  A.  Red.

25  Q.  Did any involve a gun?

1    A.   Yes, they did.

2    Q.   Where did the arrest take place?

3    A.   At 506 West 151st Street, apartment no. 2, in New York, New

4    York.

5    Q.   Can you briefly describe how you came to be at that

6    address?

7    A.   We came to be at this address through the examination of

8    phone records and conducting interviews in the area.

9    Q.   Approximately what time did you arrive at the address that

10   day?

11   A.   Approximately 8:30 in the morning.

12   Q.   Can you please describe the weather conditions?

13   A.   It was sunny outside, the weather was warm.

14   Q.   How many law enforcement officers were with you that day?

15             THE COURT:   What time of day was this?

16             THE WITNESS:   It was 8:30 a.m., approximately.  Sorry.

17             THE COURT:   Sorry, Mr. Cooper.

18   BY MR. COOPER:

19   Q.   How many police officers were you with that day?

20   A.   Eight, including me.

21   Q.   Can you please describe for the Court the layout of the

22   building?

23   A.   The building is a multi-unit, multi-story, brick-front unit

24   or apartment complex.  There is a front door, small entryway,

25   another door, and then a main hallway where you can have access

1    to the rest of the apartments in the building.

2    Q.  Did there come a time when you knocked on any of the

3    apartment doors at that address?

4    A.  Yes.

5    Q.  Which apartment?

6    A.  No.  2.

7    Q.  And where was that in the building?

8    A.  That was as soon as you walk through the foyer it was it

9    the first door on the left.

10   Q.  What happened after the -- what happened next?

11   A.  A Spanish-speaking female, last name Guzman, came to the

12   door.  One of our Spanish-speaking agents, Elizabeth Wheeler

13   spoke with Mrs. Guzman, showed her a photograph of Mr. Calix

14   and, in short, she told -- Mrs. Guzman told Special Agent

15   Wheeler that Mr. Calix was staying in a room and that room was

16   directly behind her.

17   Q.  Can you please describe for the Court the layout of the

18   apartment?

19   A.  There was a front door and then about seven feet beyond the

20   front door straight inside the apartment was another door, it

21   was a bedroom door.  Between the front door and that bedroom

22   door was another hallway that ran left and right.

23   Q.  And which is the door that the woman who answered the door

24   was pointing to?

25   A.  The one that was directly behind her.

1   Q.  What happened next?

2   A.  After learning that Mr. Calix was staying in that room

3   several agents, including myself, lined up on the door and we

4   used force to open that door.  Immediately upon opening the

5   door we saw Mr. Calix standing inside the bedroom behind the

6   door just off to the left side.

7   Q.  What were you and the other agents wearing?

8   A.  We were all wearing either our green FBI-issued body armor

9   that says "FBI" at least on front and the back, or I am sure

10  some people were wearing blue FBI rain jackets.

11  Q.  At the time you first saw Mr. Calix was your weapon drawn

12  or holstered?

13  A.  It was drawn.

14  Q.  What about the other agents?

15  A.  They were drawn.

16  Q.  What was Mr. Calix wearing when you first saw him?

17  A.  He was wearing jeans and no shirt.

18  Q.  What happened next?

19  A.  Mr. Calix was ordered to put his hands up; he complied.  He

20  was then ordered to the ground; he complied.  When he was put

21  onto the ground or ordered to the ground he was half in his

22  bedroom door -- or half in his room and half in that small

23  hallway.  I got on top of him and handcuffed him.

24  Q.  Was Mr. Calix left on the ground there or was he moved?

25  A.  He was moved soon after being put on the ground there.

1    Q.   Where to?

2    A.   Just in front of the front door to the apartment off to the

3    left-hand side.

4    Q.   Was that in the lobby of the apartment building?

5    A.   There is, like, a foyer and then the main hall.  The main

6    hall was bigger, he was put in the main hall.

7                 THE COURT:  The main hall of the apartment house?

8                 THE WITNESS:  The apartment complex.

9                 THE COURT:  Or the main hall of the bedroom?

10                THE WITNESS:  The main hall of the apartment complex

11   itself.  The hallways in the apartment were very narrow and

12   very small.

13   BY MR. COOPER:

14   Q.   Where was Mr. Calix positioned when he was taken to that

15   area in relation to the door of the apartment?

16   A.    Initially when we brought him out and I searched him he was

17   just outside the door and to the left, later, not too terribly

18   long after we moved him a little further away from the door

19   just a few feet and he sat in a corner kind of facing the front

20   door.

21   Q.   Was he facing the door of the apartment or facing away from

22   the door of the apartment?

23   A.   At an angle.

24   Q.   Did there come a time when you asked Mr. Calix his name?

25   A.   Yes.

Q.  What, if anything, did he say in response?

A.  When we initially contacted Mr. Calix and he was standing

in the apartment, while I was putting handcuffs on him I asked

him what his name was.  He gave me a combination of a couple of

his aliases.

Q.  What did you do next?

A.  After I handcuffed him I searched his pockets.  In his back

pocket I found an I.D. that said Andre Calix on it.

Q.  Did you find anything else in his pockets when you did

that?

A.  Yes.

     Once we stood him up and brought him outside the

apartment I finished the search of his person and found

approximately $1,800 cash in his front jeans pocket.

Q.  You mentioned that Mr. Calix had been taken out to the main

hallway area.  Was he offered anything to eat or drink when he

was out there?

A.  He was.

     THE COURT:  Which place?  The initial stop or initial

place he was placed outside the apartment or when he was moved?

     THE WITNESS:  Both.  I am certain that he was offered

at least water in both places but the first time he was offered

water he was also offered medical attention because he was

kneeling on the ground and he was -- or sitting on the ground

and he was sweating profusely and he was breathing heavily.

1   BY MR. COOPER:

2   Q.   Did there come a time when Mr. Calix calmed down?

3   A.   Yes.

4   Q.   How long did that take?

5   A.   I would say approximately 5 to 10 minutes.

6   Q.   You mentioned earlier that Mr. Calix was not wearing a

7   shirt when he was arrested.  Did there come a time when you or

8   others agents got him a shirt?

9   A.   Yes.

10  Q.   When was that?

11  A.   After he signed the consent to search and before he was

12  transported back to the main FBI building.

13  Q.   You just mentioned a consent to search.  Did there come a

14  time when you asked Mr. Calix if he would consent to a search

15  of his bedroom?

16  A.   Yes.

17  Q.   When did that happen?

18  A.   After Mr. Calix had calmed down, while he was in the second

19  position sitting on the ground.

20  Q.   Can you please describe Mr. Calix' demeanor when you had

21  the conversation about the consent to search?

22  A.   At that point he had stopped perspiring, he was breathing

23  normally and was just sitting quietly.

24  Q.   What did you say to Mr. Calix during that conversation?

25  A.   During the -- I showed him the consent to search form which

1    had already been filled out, I told him to read the form as I

2    read it to him.  I then read the form out loud.  After I

3    finished reading the form I asked him if he understood; he said

4    yes.  At some point either before I read him the consent search

5    or after I read the consent search it is my general practice to

6    say if you decide you don't want to consent to the search then

7    we will likely apply for a search warrant.

8    Q.  Do you have any reason to think you did not follow that

9    general practice here?

10   A.  No.

11               MR. COOPER:  Your Honor, may I approach?

12               THE COURT:  All right.

13   Q.  Showing you a document marked for identification Government

14   Exhibit 1, do you recognize this document?  How do you

15   recognize it?

16   A.  I recognize it by my signature.

17   Q.  What is this document?

18   A.  The consent to search form that I used that day with

19   Mr. Calix.

20               MR. COOPER:  The government offers Exhibit 1.

21               MS. BAUMGARTEL:  No objection.

22               THE COURT:  Exhibit 1 is admitted in evidence.

23               (Government's Exhibit 1 received in evidence)

24   BY MR. COOPER:

25   Q.  Can you please describe what, if anything, you said to

1   Mr. Calix about this form?

2   A.   Again.  I showed him the form.  I explained to him that

3   this is a consent to search form.  I then read the form out

4   loud to him with the form facing him so that he could read it.

5   I encouraged him to read it, as I always do, and then after I

6   finished reading it I asked him if he understood and then asked

7   him to sign.

8   Q.   And did he sign there at the bottom?

9   A.   Yes, he did.

10  Q.   Is that your signature at the bottom of Exhibit 1?

11  A.   Yes, it is.

12          THE COURT:  What was his answer as to whether he

13  understood it.

14          THE WITNESS:  He said yes, sir.

15  BY MR. COOPER:

16  Q.   Agent Floyd, where were you positioned with respect to

17  Mr. Calix when you had this conversation you are describing?

18  A.   I was kneeling down in front of him.

19  Q.   Was anyone else near you at the time?

20  A.   I believe one other agent or detective was with me but I

21  don't remember whom it was.

22  Q.   Was that other agent standing or kneeling down?

23  A.   I do not remember.

24  Q.   Can you describe your tone of voice when you were talking

25  to Mr. Calix about this consent to search form, Exhibit 1?

1   A.  It was just as it is now; calm, not elevated.

2   Q.  Was your weapon holstered or drawn?

3   A.  It was holstered.

4   Q.  Agent Floyd, there is handwriting here on Exhibit 1 that

5   says:  Entire Interior of 506 West 151st Avenue.

6              Who wrote that?

7   A.  I did.

8   Q.  When did you write that?

9   A.  Prior to asking for Mr. Calix' consent.

10  Q.  It says 151st Avenue.  Did you mean avenue or street?

11  A.  I meant Street.

12  Q.  Did Mr. Calix ask you any questions when you were reviewing

13  this form with him?

14  A.  No, he did not.

15  Q.  After Mr. Calix signed this form did you ask him any

16  questions?

17  A.  After he signed the consent form it is my general practice

18  to ask if there is anything dangerous inside the apartment that

19  we should be aware of.

20  Q.  Did you do that in this instance?

21  A.  Yes.

22  Q.  How did Mr. Calix respond?

23  A.  He said no.  I then asked him where the gun was.

24  Q.  What did he say?

25  A.  He said that it was in his bedroom on the side of his

1    mattress.

2    Q.  Did you later learn that a gun was recovered from

3    Mr. Calix' bedroom?

4    A.  Yes.

5    Q.  Did you learn where it was recovered from?

6    A.  In a bag inside near the side of the mattress.

7    Q.  What did you do after that?

8    A.  After he signed the consent to search he was re-handcuffed,

9    he was asked if he wanted a shirt.  The agent got him a shirt

10   and then he was escorted outside to my FBI vehicle.

11   Q.  Had a search been initiated prior to that time?

12   A.  Not prior to the consent to search, no.

13   Q.  At what point was a search initiated?

14   A.  Immediately upon him signing the form.

15            THE COURT:  A search of the entire apartment or a

16   search of the defendant?

17            THE WITNESS:  It was a search only of his bedroom

18   inside that apartment.

19            THE COURT:  And what about had no prior searches been

20   made of his person?

21            THE WITNESS:  I searched his person when he was

22   arrested but there was no other search of property until the

23   consent search.

24            THE COURT:  No search in his immediate area of arrest?

25            THE WITNESS:  I know that when he was handcuffing him

1   two agents went into the room to look for people to make sure

2   that no one else was in there for our safety.  I know that

3   while one of the agents was in there I heard one of them say I

4   found bait money or dye money -- I don't remember what the

5   phrase was.

6   BY MR. COOPER:

7   Q.  Do you have an understanding of what bait money is?

8   A.  Yes.

9   Q.  What is it?

10  A.  Bait money is money that a bank photocopies prior to

11  putting it into one of the teller's drawers.  It was a special

12  pack of money that the bank does not give out unless there is a

13  bank robbery.

14  Q.  You also mentioned dye money; what is dye money?

15  A.  Often times the bait money is wrapped with a dye pack or a

16  chemical device that emits a red dye.

17          THE COURT:  That happened before you got the consent

18  to search?

19          THE WITNESS:  Yes, sir.  When the agents went in

20  looking for people, that's when I heard that, yes, sir.

21          THE COURT:  Okay.

22  Q.  Agent Floyd, what would you have done if Mr. Calix did not

23  consent to a search?

24  A.  I would have applied for a search warrant.

25  Q.  Did you have any doubt that you would be able to obtain a

E2A5calH                    Floyd - direct

1    search warrant?

2    A.   No.

3    Q.   Why not?

4    A.   Once we are there we learned that that was his primary

5    residence.  Upon search incident to arrest --

6            THE COURT:  How did you learn it was his primary

7    residence?

8            THE WITNESS:  Mrs. Guzman, whom Agent Wheeler

9    interviewed, said that he had signed a lease with her -- or his

10   girlfriend had signed a lease for him to stay there and he had

11   been staying there for some time.  I don't know how long.

12           Upon searching his person we found $1,800 in cash.  I

13   heard one of the persons say they found bait money or dye

14   money.  At that point also I would have had time, if necessary,

15   to step back with the other agents and conferenced about what

16   somebody else may know or have observed that I didn't.

17   BY MR. COOPER:

18   Q.   And what would you have expected to find in that bedroom?

19   A.   We would have expected to find, potentially, more money.

20   We could have found -- we expected to find money that had dye

21   stains on it.  We expected to potentially find notes with bank

22   addresses or other addresses; expected to find clothing that

23   possibly matched some of the clothing that he wore during the

24   seven bank robberies.

25   Q.   Now, you mentioned earlier that this was a time when

1    Mr. Calix was taken from that address --

2              THE COURT:  Why did you expect to find clothing that

3    he had worn during the robbery?

4              THE WITNESS:  In my training and experience when you

5    find someone you suspect of committing multiple crimes it is

6    often the case that inside their home they keep

7    instrumentalities or evidence of the crime.  Often times people

8    don't get rid of clothing.  So, that is something that we

9    commonly look for.

10   BY MR. COOPER:

11   Q.  In the course prior to this time prior to the arrest of

12   Mr. Calix, had you seen surveillance photographs from some of

13   the bank robberies that he was charged with committing?

14   A.  Yes.

15   Q.  Was Mr. Calix, in those photographs, wearing distinctive

16   articles of clothing?

17   A.  Yes.

18   Q.  You mentioned that there came a time when Mr. Calix was

19   moved from the lobby of the building where he was arrested.

20   A.  Correct.

21   Q.  Approximately what time was that that he was moved?

22   A.  Between 9:00 a.m. and 9:30.  Approximately.

23   Q.  Prior to his being moved was there anything that you said

24   to Mr. Calix other than what you testified to so far?

25   A.  Asking for food, medical attention.  Other than what I have

E2A5calH                         Floyd - direct

 1   said, no, sir.

 2   Q.   Where was he moved to?

 3   A.   He was moved to the back seat of my vehicle.

 4   Q.   Who else was in the car?

 5   A.   NYPD Detective Mark Fishstein and Special Agent Ben Langel.

 6   Q.   Who was driving the car?

 7   A.   I was.

 8   Q.   Where was Mr. Calix?

 9   A.   He was in the back seat directly behind me, I believe.

10   Q.   Was there anyone else in the car?

11   A.   The two people I just spoke of; Detective Fishstein and

12   Mr. Langel.

13   Q.   Where were they positioned in the car?

14   A.   Detective Fishstein was in the back seat with Mr. Calix and

15   Special Agent Langel was in the front seat passenger.

16   Q.   During that car ride did you say anything to Mr. Calix?

17   A.   I don't remember saying anything; no, sir.

18   Q.   Did you hear Detective Fishstein say anything to Mr. Calix?

19   A.   Yes.

20   Q.   What did you hear him say?

21   A.   I don't remember the entire conversation but I know that it

22   was something along the lines of if you cooperate, things will

23   likely go better for you.

24   Q.   Anything else that you remember from that car ride?

25   A.   I believe Special Agent Ben Langel was in on that

 1  particular conversation but I don't remember anything else.

 2  Q.  When you arrived at the FBI offices where did you go?

 3  A.  We went to an interview room on the 23rd floor.

 4  Q.  Can you please describe that room for the Court?

 5  A.  It is a medium-sized interview room, rectangularly shaped

 6  with a rectangular table against one wall kind of in the middle

 7  of the room.

 8  Q.  About how big is the room?

 9  A.  I would say approximately 12 by 8.

10  Q.  Who was in the room?

11  A.  Detective Fishstein, Mr. Calix, and me.

12  Q.  Can you describe where everybody was situated?

13  A.  Detective Fishstein, I believe, was sitting at the head of

14  the table, I was sitting across from Mr. Calix, and Mr. Calix

15  was sitting on the other side of me across from me.

16          THE COURT:  He was sitting on the long side?

17          THE WITNESS:  Detective Fishstein, I believe, was

18  sitting on the long side, the head of the table, and Mr. Calix

19  and I were across from each other.

20  BY MR. COOPER:

21  Q.  Was Mr. Calix handcuffed?

22  A.  No.

23  Q.  Was he offered anything to eat or drink?

24  A.  Yes.

25  Q.  What?

E2A5calH                    Floyd - direct

1   A.  He was offered whatever kind of food he may want,

2   especially any breakfast items or coffee or water.  He said he

3   didn't want anything but coffee so we got him coffee.

4   Q.  Was your weapon drawn or holstered?

5   A.  Holstered.

6   Q.  What, if anything, did you say to Mr. Calix?

7   A.  At that point I showed him the Miranda form, the advice of

8   rights form.  I read that form aloud to him and encouraged him

9   to read it as I read it to him.  After reading the form I asked

10  him if he understood.  He verbally replied yes and then he

11  signed the form.

12  Q.  I'm showing you what's been marked for identification as

13  Government Exhibit 2.  Do you recognize that document?

14  A.  I do.

15  Q.  How do you recognize it?

16  A.  I recognize it by my signature.

17  Q.  What was it?

18  A.  This is the advice of rights form that I used with

19  Mr. Calix on that day.

20          MR. COOPER:  The government offers Government Exhibit

21  2.

22          MS. BAUMGARTEL:  No objection.

23          THE COURT:  Exhibit 2 is admitted in evidence.

24          (Government's Exhibit 2 received in evidence)

25  BY MR. COOPER:

1    Q.  Does this exhibit indicate a time when it was read?

2    A.  Yes, sir; 10:44 a.m.

3    Q.  Who filled that in?

4    A.  I did.

5    Q.  And I think your testimony earlier was that you read this

6    form to Mr. Calix?

7    A.  Yes.

8    Q.  Did you read it verbatim?

9    A.  Yes.

10   Q.  What was your tone of voice when you were talking to

11   Mr. Calix?

12   A.  Just as it is now.

13   Q.  What was Mr. Calix' demeanor during this conversation?

14   A.  His demeanor was calm, he was kind of quiet, cooperative.

15   Q.  Did he sign this form in front of you?

16   A.  Yes, he did.

17   Q.  Did you briefly summarize what Mr. Calix said after signing

18   this form?

19   A.  After he signed the advice of rights form we showed him

20   photographs of the seven bank robberies.  He admitted to all

21   seven including the one with the gun.  He then explained that

22   the reason he started robbing banks was he just got out of

23   jail, he didn't have any money, that he was an alcoholic.  He

24   also explained where he bought the gun from.

25            MR. COOPER:  One moment, please, your Honor.

1          (counsel conferring)

2     BY MR. COOPER:

3     Q.  With respect to Government Exhibit 2 when you were

4     discussing this form with Mr. Calix, did he say or do anything

5     to indicate that he understood the advice of rights on this

6     form?

7     A.  Before he signed I asked him do you understand your rights?

8     There is a line that says -- I'm sorry, there is no line.  I

9     just say do you understand and I remember him clearly saying

10    yes.

11          THE COURT:  Before you said "do you understand" did

12    you read him his rights?

13          THE WITNESS:  Yes, sir.  I didn't ask him.

14          THE COURT:  Or did you ask him to read the rights?

15          THE WITNESS:  It was -- I have the form.  I put the

16    form in front of him so that he could read it because I'm

17    sitting across the table.  I read the form upside down and

18    asked -- before I started reading I encouraged him to read it

19    as I was reading it to him.

20          THE COURT:  And after each question did you ask him

21    the question?

22          THE WITNESS:  After each?  No, sir.  At the end of

23    reading him the form I asked him.

24          THE COURT:  Okay.

25    BY MR. COOPER:

1    Q.  To be clear, Agent Floyd, did you read Mr. Calix everything

2    that is printed on this advice of rights form?

3    A.  Yes, I did.

4    Q.  At what point did you ask Mr. Calix if he understood these

5    rights?

6    A.  When I had finished reading everything on the form.

7    Q.  What did he say to you at that point?

8    A.  He said -- I asked if he understood.  He said yes.

9    Q.  Is that Mr. Calix' signature at the bottom of the form?

10   A.  Yes, it is.

11            MR. COOPER:  One moment, please?

12            THE COURT:  Did you see him sign it?

13            THE WITNESS:  Yes.

14            Yes, sir.

15            THE COURT:  Then and there at that time?

16            THE WITNESS:  Yes, sir.

17            MR. COOPER:  No further questions, your Honor.

18            THE COURT:  Ms. Baumgartel?

19   CROSS EXAMINATION

20   BY MS. BAUMGARTEL:

21   Q.  Good afternoon, Agent Floyd.

22   A.  Good afternoon, ma'am.

23   Q.  So, what was your tone of voice when you opened Mr. Calix'

24   door and told him to get on the ground?

25   A.  Likely elevated.

1   Q.  Does that mean you yelled?

2   A.  Yes.

3   Q.  So let's go through that sequence.

4           So, you were there with approximately eight armed law

5   enforcement agents in SWAT gear, right?

6   A.  Not in SWAT gear; no, ma'am.

7   Q.  I think you said that you probably had on your, quote, raid

8   jackets or your body armor?

9   A.  Correct.

10  Q.  So you were there in body armor or raid jackets all with

11  your weapons, right?

12  A.  That is correct.

13  Q.  You forcefully broke open the door to his bedroom, right?

14  A.  Yes.

15  Q.  You yelled at him to get on the ground?

16  A.  Yes.

17  Q.  You had your guns drawn?

18  A.  Correct.

19  Q.  You then got on top of him, right?

20  A.  Yes.

21  Q.  And you put handcuffs on him --

22  A.  Beside him, on top of him.  I wasn't -- I wasn't straddling

23  him.

24  Q.  You were on top of him?

25  A.  On the side partially on top of him.  It is a very small

E2A5calH                    Floyd - cross

1   hallway.

2   Q.  So this was all in a very small space, right?

3   A.  Yes, ma'am.

4   Q.  And after you handcuffed him you searched him, right?

5   A.  I searched his person; yes, ma'am.

6   Q.  You took things out of his pockets?

7   A.  Correct.

8   Q.  And at this time Mr. Calix was half-dressed, right?

9   A.  Correct.

10  Q.  And you and the other agents took him out of the hallway,

11  right?

12  A.  Yes.

13  Q.  And he was sweating profusely and breathing heavily, right?

14  A.  Yes.

15  Q.  In fact you were concerned that he needed medical

16  attention, right?

17  A.  Potentially.

18  Q.  Isn't it true that he actually almost fainted?

19  A.  I do not know.

20  Q.  He looked to you like he needed medical attention, right?

21  A.  He was sweating profusely.

22          I don't have a problem calling an ambulance for

23  somebody who looks like they may be overly anxious.  I don't

24  know.  I'm not a medical doctor.

25  Q.  So he looked like he might need that sort of medical

1    attention, right?

2    A.   If he felt he did I would provide it.

3    Q.   You asked because he looked like he needed it, right?

4    A.   It is a very common practice when somebody comes out

5    sweating and breathing heavily.  Maybe they have a medical

6    problem that they're not telling me about.

7    Q.   Right.

8          His appearance made it seem like he might have a

9    medical problem, right?

10   A.   Potentially.

11   Q.   But you didn't get him any medical treatment, right?

12   A.   He said he didn't need anything.

13   Q.   Instead you had him, five minutes later, sign this consent

14   to search?

15   A.   It was about five or 10 minutes before he calmed down.

16   Q.   And you immediately had him sign the consent to search; is

17   that right?

18   A.   I don't remember the exact time line, ma'am.

19   Q.   You just testified on direct, right?

20   A.   And I just restated; yes, ma'am.

21   Q.   And you tried to answer the questions on direct as

22   truthfully and completely as possible, right?

23   A.   Correct.

24   Q.   And you just answered on direct that it was about five

25   minutes later that he signed the consent form, didn't you?

1    A.  No, ma'am.  I said it was five or 10 minutes before he

2    calmed down before we moved him to the second position.

3    Q.  Where was the second position?

4    A.  Just a few feet away from where he was at sitting up

5    against the wall.

6    Q.  So he was up against a wall, right?

7    A.  Correct.

8    Q.  And handcuffed, right?

9    A.  He was.

10   Q.  And were all eight agents around him at this time?

11   A.  No, ma'am.

12   Q.  Where were all the agents?

13   A.  I don't know where everybody was but I know that they

14   weren't all standing around him.

15           THE COURT:  Was he handcuffed in the back?

16           THE WITNESS:  His hands were cuffed behind him, yes,

17   sir; and he was sitting on the ground.

18   BY MS. BAUMGARTEL:

19   Q.  Some of the agents went into the room to do a security

20   sweep, right?

21   A.  When he was initially contacted, yes.  When we initially

22   used force to enter the door, yes.

23   Q.  And then after Mr. Calix was taken out did all of the

24   agents leave the room?

25   A.  Yes.

1   Q.  So where did they go if they weren't standing around him?

2   A.  I couldn't testify to their exact whereabouts.  I know that

3   there were agents in the hallway further way from me down the

4   hall.  This is a very large hallway, I know that there were

5   agents outside.

6   Q.  I'm sorry.  I thought you testified on direct that it was a

7   small hallway.

8   A.  No.  The bedroom hallways -- the apartment hallways are

9   very small.  The hallway in the apartment complex that leads to

10  the front door is very large.

11  Q.  So you had all left the apartment complex?

12          THE COURT:  What do you mean by the apartment complex?

13  Q.  So let me take a step back.  Perhaps you can again describe

14  the building that you entered where you arrested Mr. Calix.

15  A.  From the outside there is a small foyer, not a very large

16  entryway.  There is a door that leads to the outside and then a

17  small foyer probably 10 feet approximately -- I don't know, I

18  have only been there once -- another door that acts as a

19  secondary security door.  Once you get through that second door

20  that is that initial entryway then it opens up into a larger

21  hallway where you can gain access to the other apartments.

22  Q.  And who gave you permission to enter those security doors

23  that morning?

24  A.  I believe it was -- I wasn't there when we initially got

25  through the security doors.

 1    Q.   You didn't have a warrant to enter that building, right?

 2    A.   No, we did not.

 3    Q.   In fact, when you had first set out that day you didn't

 4    have any specific information that Mr. Calix was even in that

 5    building, right?

 6    A.   When we first set out?  No, we did not.

 7    Q.   Based on the toll record information you had you thought he

 8    was in a different building, right?

 9    A.   We thought he was next-door.

10    Q.   And you spoke to some people next-door and you got some

11    information that he might be a building over, correct?

12    A.   That is correct.

13    Q.   Did you personally get this information?

14    A.   Which part, ma'am?

15    Q.   That Mr. Calix might be in the building next-door?

16    A.   There were numerous people who said this.  I spoke to two

17    of them.

18    Q.   So you spoke to two people and what did they tell you about

19    where Mr. Calix might be?

20    A.   One of them, whom we found out was lying because she was

21    his girlfriend, said that she possibly had seen somebody who

22    looked like that living in the apartment next-door.

23    Q.   So a person who you found to be unreliable gave you

24    information that he might be next-door?

25    A.   No.  We found it unreliable but we found out that was his

1    girlfriend and that she was trying to lie to us when she

2    initially stated she didn't know who he was.  When I showed her

3    the photograph of him and he she said "*oh*."  I asked why and

4    she said, oh, I just didn't know people still rob banks.

5    Q.  I'm sorry.  Let's focus very clearly on before you entered

6    this building.

7              You had a conversation with a person that you later

8    identified as Mr. Calix' girlfriend?

9              MR. COOPER:  Your Honor, can we have some

10    specification about which building we are referring to?

11    BY MS. BAUMGARTEL:

12    Q.  506 West 151st Street; before you entered that building --

13    A.  Okay.

14    Q.  -- you had a conversation with a person that you later

15    identified as Mr. Calix' girlfriend; is that right?

16    A.  That is correct.

17    Q.  And when did you speak with her?

18    A.  I spoke with her prior to going to 506?  Is that what you

19    are asking?

20    Q.  Yes.  Immediately before?

21    A.  Several minutes.

22              We were -- we showed up in the apartment complex, we

23    were knocking on that door, the one next-door that you are

24    referring to for 10 or 15 minutes before somebody came to the

25    door and somebody finally came to the door.  The person who

E2A5calH                    Floyd - cross

1    came to the door allowed us to enter and speak to other

2    residents.  These are all sublet apartments or sublet rooms

3    inside of one apartment and I know from speaking with the

4    person whom I spoke with who we are discussing and also

5    speaking with other agents when I was done discussing with her

6    that people, not just the one I was speaking to, said that they

7    had seen him in the area and they thought he was staying in the

8    room next-door.

9              THE COURT:  In the room next-door?

10             THE WITNESS:  I'm sorry; in the apartment next-door.

11             THE COURT:  Apartment house or apartment?

12             THE WITNESS:  The girl I spoke with said that she

13   thought he was in the apartment building next-door.  Other

14   people -- other agents learned that -- other agents were told

15   that he was possibly staying or likely staying in the apartment

16   building next-door in the first apartment when you walk through

17   the door.

18   BY MS. BAUMGARTEL:

19   Q.  You personally did not receive that information, right?

20             THE COURT:  Which information?

21   BY MS. BAUMGARTEL:

22   Q.  That he was staying in the building next-door in the first

23   apartment when you walked through the door?

24   A.  No, we did not.

25   Q.  And you don't know how law enforcement officers gained

1    access to the interior of that building; is that right?

2    A.   Do I know to be able to testify a hundred percent?  No.

3    But I can tell you they likely saw somebody coming out and

4    asked them if they can come in.

5    Q.   You said "they likely."  You don't know how they got access

6    into that building, right?

7    A.   Correct.

8    Q.   Do you still have Government Exhibit 1 in front of you, the

9    consent form?

10   A.   Yes, ma'am.

11   Q.   That doesn't actually refer to the address that you

12   searched, does it?

13   A.   Yes, it does.

14   Q.   Can you just read the address that's on that form?

15   A.   If you are referring to the address, ave versus street, I

16   made a mistake.

17   Q.   Can you please tell me which address you mean?

18   A.   506 West 151 Ave, Manhattan, morning.

19   Q.   So you did not search 151st Ave, correct?

20   A.   No, we did not.

21   Q.   You searched a different address?

22   A.   We searched Street.

23   Q.   Okay.

24        Let's take another step back.  You were not part of

25   the security sweep of Mr. Calix' room, is that right?

1    A.   Correct.

2    Q.   But you initially did see into the room when you arrested

3    him, right?

4    A.   I know that I saw beyond him but I was focused on him.

5    Q.   Did you see a gun when you looked into the room?

6    A.   No.  He was not holding a gun at that time.

7    Q.   And you didn't see a gun anywhere else in the room that you

8    could see, right?

9    A.   Ma'am, I looked at him.  He was the danger in that room at

10   that time, my focus was him.

11   Q.   So you weren't focused about his grab area?

12   A.   I was focus on him and controlling his movements.

13   Q.   After you took him out you were the primary person talking

14   with him about the consent to search form; is that right?

15   A.   That is correct.

16   Q.   Before you started asking him about a consent to search you

17   did not inform him of his Miranda Rights, correct?

18   A.   Correct.

19   Q.   Even though he was already under arrest?

20   A.   Correct.

21   Q.   You didn't tell him that he had the right to remain silent?

22   A.   We don't have to.

23   Q.   You don't have to tell someone when they're arrested that

24   they have the right to remain silent?

25   A.   Not until we start questioning them.

1    Q.  You asked Mr. Calix questions immediately after you put

2    handcuffs on him, right?

3    A.  What questions are you referring to, ma'am?

4    Q.  The answer is yes, right?

5    A.  I don't know what questions you are referring to.  If you

6    are referring to: *What is your name?*  Yes.  *Do you have any*

7    *knives, weapons, needles; anything that is going to cut, poke*

8    *hurt me or you*?  I definitely ask that because I always do.  *Is*

9    *there anything dangerous in the room we need to know about?*  I

10   did ask that.

11   Q.  So you asked those questions?

12   A.  Those are legal for me to ask, yes.

13   Q.  So you asked them, right?

14   A.  Yes.

15   Q.  And that was before you gave him any Miranda warnings,

16   right?

17   A.  Correct.

18   Q.  So you did start asking him questions before you gave him

19   Miranda warnings, right?

20   A.  That's not considered custodial interrogation.

21   Q.  So, asking someone in handcuffs questions is not, according

22   to you, custodial interrogation?

23            THE COURT:  That is what he said.  Sorry but it is not

24   a "so" question.  You said "so" as part of your question.

25            MS. BAUMGARTEL:  Withdrawn, your Honor.

E2A5calH                    Floyd - cross

1   BY MS. BAUMGARTEL:

2   Q.  Did you encourage Mr. Calix to sign the consent form?

3   A.  What do you mean by encourage?

4   Q.  Did you tell him it would be in his interest to sign the

5   consent form?

6   A.  I honestly don't remember.

7   Q.  Do you have a practice of telling people that it is in

8   their interest to cooperate?

9   A.  Yes.

10  Q.  Is it possible that you said that to Mr. Calix when you

11  showed him the form?

12  A.  Yes.

13  Q.  You also did tell him that you could get a warrant if he

14  didn't sign it, right?

15  A.  I didn't say we could get a warrant.

16  Q.  What did you say?

17  A.  We could apply for a search warrant.

18  Q.  You said you would go to the Judge and ask for a warrant,

19  right?

20  A.  My words are "apply."  If somebody else said we can go to a

21  Judge then that may have been what they said.

22  Q.  Did anyone else speak to Mr. Calix about the consent form?

23  A.  I was the one reading the form.  I don't know what may have

24  been said.  I stepped outside when he was sitting up against

25  the wall to get the consent form and then I came back inside.

E2A5calH                    Floyd - cross

1    Q.   So you don't know if another officer may have said

2    something to Mr. Calix about the consent to search form outside

3    your presence?

4    A.   Correct.

5    Q.   And so you didn't have the consent to search form with you

6    when you arrested him; is that right?

7    A.   That is correct.

8    Q.   You had to step out to get it?

9    A.   It was in my car.

10   Q.   And so about how long did it take you to go out to your car

11   and come back?

12   A.   Probably just a couple minutes.

13   Q.   Then after you returned with the form did you say anything

14   else to Mr. Calix about the form?

15   A.   I read the form, as I testified.

16   Q.   Did you say anything else about the form?

17   A.   No, ma'am.

18   Q.   And did he sign it?

19   A.   Yes, he did.

20   Q.   Did you uncuff him to sign it?

21   A.   Yes.

22   Q.   And then did you recuff him?

23   A.   Yes.

24   Q.   Now, while you were doing this you had to go out to the

25   car; you don't know exactly where all the other agents were,

1    right?

2    A.  I don't.  I know when I left there was one or two standing

3    nearby that I would have asked to just keep an eye on him and

4    when I returned there were those one or two were still standing

5    there.

6    Q.  Did you participate in any way in the search of Mr. Calix'

7    apartment?

8    A.  No, ma'am.

9    Q.  So you have no personal knowledge from about where things

10   were recovered from within the apartment; is that right?

11   A.  Other than what I have read in the reports, no, ma'am.

12   Q.  So, Mr. Calix was arrested at about 8:30; is that right?

13   A.  That's about the time that we got to the apartment; yes,

14   ma'am.

15   Q.  And it was about two hours later that you brought him to

16   FBI headquarters; is that right?

17   A.  That's approximately the time we arrived at FBI

18   headquarters.

19   Q.  Now, prior to taking Mr. Calix to FBI headquarters, did you

20   tell him that he had the right to promptly be presented to a

21   Judge?

22   A.  No, I did not.

23   Q.  Did you ask him if he wanted to waive his right to promptly

24   be presented to a Judge?

25   A.  No, I did not.

E2A5calH                    Floyd - cross

1   Q.  Did you ask him if he wanted to return to FBI headquarters

2   with you to answer questions?

3   A.  No, ma'am.

4   Q.  And you drove him from where you arrested him directly to

5   26 Federal Plaza, right?

6   A.  As is our practice; yes, ma'am.

7   Q.  You didn't take him to 500 Pearl Street to be presented,

8   right?

9   A.  Correct.

10  Q.  Instead you immediately put him into an FBI interrogation

11  room, right?

12  A.  You mean into a witness room?  Yes, ma'am.  Or into an

13  interview room, interrogation room?  Yes, ma'am.

14  Q.  Sorry, interview room.

15          And at no time did Mr. Calix say that he wanted to

16  stay and answer questions rather than going to be presented to

17  a Judge, right?

18  A.  He did not say those words, no.

19  Q.  Now, the first time that you or anyone informed Mr. Calix

20  of his Miranda Rights was in that interview room, right?

21  A.  Correct.

22  Q.  And this is despite the fact that you and other agents had

23  been speaking to Mr. Calix throughout this entire period,

24  right?

25          MR. COOPER:  Objection, your Honor.  Misstates the

1   testimony.

2           THE COURT:  Objection sustained.  Calls for a

3   conclusion.  This witness wasn't present.

4   BY MS. BAUMGARTEL:

5   Q.  You were present for Mr. Calix' car ride down to FBI

6   headquarters, right?

7   A.  Yes.

8   Q.  And there were two other agents with you in the car at that

9   time, right?

10  A.  Correct.

11  Q.  And one of the agents was -- is it Agent Langel?

12  A.  Ben Langel; yes, ma'am.

13  Q.  And another was Detective Fishstein; is that right?

14  A.  Yes.

15  Q.  And those two individuals were present in the car?

16  A.  Yes.

17  Q.  And you heard the two of them having a conversation with

18  Mr. Calix, right?

19          MR. COOPER:  Objection.  Misstates the testimony.

20          THE COURT:  I will allow the question.

21  Q.  You heard them having a conversation with Mr. Calix, right?

22  A.  They were speaking in the car.  There was -- yes.  I don't

23  know what your definition of conversation is.

24  Q.  Well, on direct testimony isn't it true that you testified

25  you didn't hear the -- quote -- entire conversation between

1  Mr. Calix and the detectives speaking to him?

2  A.   Correct.  I heard the whole thing but I don't recall

3  exactly what was said.

4  Q.   Right.

5          So it was a conversation, right?

6  A.   There were at least two people talking.

7  Q.   And it was more than just a single question, right?

8  A.   There wasn't -- I don't recall questions.  It was speaking

9  to him.  It was somewhere along the lines of, as we generally

10  do, hey, this is -- if you cooperate it could go better for

11  you.  What do you think looks better for you?  A person who

12  tells the truth or a person who is guilty and lies about it?

13  What do you think looks better in front of a Judge or the U.S.

14  Attorney's office?

15  Q.   So you said that it is sort of your standard practice to

16  say those things; is that right?

17  A.   It is.

18  Q.   And that's what was being said to Mr. Calix during his car

19  ride down to 26 Federal Plaza, right?

20  A.   Something like that; yes, ma'am.

21  Q.   He was being encouraged to cooperate, right?

22  A.   Yes, ma'am.

23  Q.   And it was being explained to him that things would be

24  better for him if he did, right?

25  A.   They could be better.  I didn't say that they would be.

E2A5calH                    Floyd - cross

1    Q.  It was explained to him that the Judge would be made aware

2    of his cooperation, right?

3    A.  Correct.

4    Q.  And the prosecutor would be made aware of his cooperation,

5    right?

6    A.  If they said what we generally do by saying that it would

7    be recorded in our reports, then yes.

8    Q.  And as best you can recall that was the substance of what

9    was being said?

10   A.  I honestly do not remember exactly what was said.

11   Q.  Now, you testified on direct that you participated in

12   hundreds of interviews; is that right?

13   A.  Correct.

14   Q.  You were participating in the interview of Mr. Calix,

15   right?

16   A.  Yes.

17   Q.  And consistent with what you said you were encouraging him

18   to speak with you during that interview, right?

19   A.  At which point are you referring to, ma'am?

20   Q.  When you were in the interview room you were encouraging

21   Mr. Calix to speak with you?

22   A.  After he signed the form and he was already talking with

23   us?  I'm sorry, I don't understand when you are saying.

24   Q.  When you showed Mr. Calix the Miranda waiver form did you

25   say anything to encourage him to sign the form?

1    A.   I didn't.  No, ma'am.

2    Q.   After he signed the form he didn't immediately answer your

3    questions, right?

4    A.   Correct.

5    Q.   And he initially denied that he had been involved in bank

6    robberies, right?

7    A.   He did.

8    Q.   And you told him that he should tell the truth and admit

9    that he was involved in bank robberies, right?

10   A.   I wasn't the one doing the questioning at that time.  That

11   is that probably happened.

12   Q.   Did you personally ask Mr. Calix any questions?

13   A.   Yes.

14   Q.   Did you personally say anything to Mr. Calix during the

15   interview?

16   A.   Yes.

17   Q.   Did you say anything about why he should cooperate or

18   answer your questions?

19   A.   I do not remember saying anything.

20   Q.   As best you can recall, did someone tell Mr. Calix that he

21   should cooperate and answer the questions?

22   A.   I remember after he signed the form there was the initial

23   discussion of, all right, let's talk about these bank

24   robberies.  And he says something along the lines of I don't

25   know what you are talking about.  So, that induced Detective

1    Fishstein to bring out the arrest book which has photographs --

2    surveillance photographs from the bank from all seven banks

3    that showed him robbing the banks.  There were also copies of

4    demand notes that were recovered, those were shown to him.

5    Once he sees the photographs he kind of understands the gig is

6    up.  At that point it is possible that Detective Fishstein was

7    like:  *At this point maybe you want to stop lying.*

8    Q.  Did you or Detective Fishstein tell Mr. Calix some of the

9    penalties he might be facing?

10   A.  I'm sure one of us did.

11   Q.  And what did you say?

12          MR. COOPER:  Sorry.

13          Your Honor, it is unclear whether we are talking about

14   pre-Miranda or post-Miranda at this point.

15   BY MS. BAUMGARTEL:

16   Q.  Pre-Miranda at any point did anyone, as far as you are

17   aware, tell Mr. Calix what sort of penalties he might be

18   facing?

19   A.  I don't know, ma'am.

20   Q.  Okay.  Post-Miranda, as far as you are aware, did anybody

21   tell Mr. Calix what penalties he might be facing?

22          MR. COOPER:  Objection, your Honor.  What the

23   defendant or anyone else said post-Miranda isn't at issue at

24   this hearing.  It is irrelevant.

25          MS. BAUMGARTEL:  Your Honor, I don't think --

1          THE COURT:  Depends on the sequence.

2          MR. COOPER:  If I may, your Honor?

3          THE COURT:  It might depend on the sequence of the

4    questions.

5    BY MS. BAUMGARTEL:

6    Q.  Post-Miranda before Mr. Calix began making any

7    incriminating statements, did you or anyone else in the room

8    tell him what sort of penalties he might be facing?

9    A.  I am sure at some point somebody did.  I apologize, ma'am,

10   I don't remember when.

11         MS. BAUMGARTEL:  Your Honor, one moment, please?

12         (pause)

13         MS. BAUMGARTEL:  I have nothing further.  Thank you.

14         THE COURT:  Redirect?

15         MR. COOPER:  Yes, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. COOPER:

18   Q.  Agent Floyd, do you recall being asked on cross-examination

19   about the car ride from the apartment where you arrested

20   Mr. Calix back to FBI headquarters?

21   A.  Yes.

22   Q.  And you testified about general practices?

23   A.  Yes.

24   Q.  Do you have a specific recollection about what was said in

25   the car on that car ride?

1    A.  I do not.

2           MR. COOPER:  One moment, please, your Honor?

3           (counsel conferring)

4           MR. COOPER:  No more questions.  Thanks.

5           THE COURT:  All right.

6           Thank you very much.

7           THE WITNESS:  Thank you, sir.

8           THE COURT:  Next witness.

9           MR. COOPER:  The government calls Corey Walsh.

10    COREY WALSH,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. COOPER:

15    Q.  Good afternoon.

16    A.  Good afternoon, sir.

17    Q.  Where are you currently employed?

18    A.  Federal Bureau of Investigation.

19    Q.  What is your position there?

20    A.  Special agent.

21    Q.  How long have you been a special agent at the FBI?

22    A.  Approximately two years.

23    Q.  What did you do before that?

24    A.  For one year I worked for Unilever, and prior to that I

25    spent four years in the United States Army.

1    Q.  What did you do in the United States Army?

2    A.  I was an infantry officer.

3    Q.  What is your current assignment at the FBI?

4    A.  I currently work in the counter-terrorism division.

5    Q.  In July 2013 what was your assignment?

6    A.  The violent crimes bank robbery task force.

7    Q.  What were your responsibilities as a special agent on the

8    violent crime task force?

9    A.  To investigate bank robberies, fugitives, kidnappings.

10   Q.  Directing your attention to July 18, 2013, were you

11   involved in the arrest of Andre Calix that day?

12   A.  Yes, sir.

13   Q.  Where did that arrest take place?

14   A.  506 151st Street, sir, in Manhattan.

15   Q.  Did there come a time when you and the other law

16   enforcement officers went inside one of the apartments at that

17   address?

18   A.  Yes, sir.

19   Q.  Where was that apartment?

20   A.  When you walk into the lobby it was directly on the

21   left-hand side.

22   Q.  Can you please describe what happened?

23   A.  When I got to that building I actually came into the back

24   door.  When I got there, walked up to the door, I saw Agent

25   Wheeler speaking Spanish to a woman who was in the doorway of

 1  that apartment and Agent Wheeler had a photograph of Mr. Calix

 2  and the lady was saying: *Si. Si. Aqui. Aqui.*

 3  Q.  What happened next?

 4  A.  We then asked Agent Wheeler to get the rest of the

 5  occupants out of that apartment and then myself and Agent Foto

 6  took position on either side of the door which was directly

 7  behind the front door of the apartment.

 8  Q.  Agent Walsh, you said you entered the apartment building

 9  from the back door; how did you get in the back door?

10  A.  I actually came from the building next-door and then around

11  the back side through the, like, exit, the rear exit of the

12  building.

13  Q.  Was that door open?

14  A.  Yes, it was.

15  Q.  After Agent Wheeler had this conversation that you just

16  testified to with the woman who answered the door, what

17  happened next?

18  A.  Myself and Agent Foto took up positions on either side of

19  the room door and Agent Foto kicked in the door.

20  Q.  What did you see when that happened?

21  A.  When Agent Foto kicked in the door I observed Mr. Calix

22  standing on the inside of the door to the left-hand side.

23  Q.  What happened when you saw Mr. Calix standing there?

24  A.  When we saw Mr. Calix Agent Foto and I grabbed his wrists

25  and pulled him to the ground, our weapons were drawn and we

1   stepped over him and I went directly straight back to the back

2   corner of the apartment and Agent Foto went to the left.

3   Q.  Why did you go in?

4   A.  To do -- check the room, make sure there was nobody else in

5   the room and also there was another door -- what appeared to be

6   another door directly to the left inside so we just wanted to

7   make sure that was secured as well.

8   Q.  Was that door inside the bedroom where you would have

9   arrested Mr. Calix?

10  A.  Yes.

11  Q.  Can you please describe the bedroom for the Court?

12  A.  It is a fairly narrow room, long, maybe 15 to 20 feet long

13  and maybe 10 to 12 feet wide.  On the right-hand side there was

14  a dresser and a TV stand in the back right corner, there was a

15  bed in the back left corner, there was another

16  dresser/nightstand sort of in the middle of the room, there was

17  a closet directly to the left when you walk in and then there

18  was what appeared to be another door also on that, the

19  left-hand wall.

20  Q.  How long were you and Agent Foto inside that room?

21  A.  Maybe a minute to two minutes maximum.

22          MR. COOPER:  May I approach, your Honor?

23          THE COURT:  Yes, you may.

24  Q.  Agent Walsh, showing you what's been marked Government's

25  Exhibit 3, 4 and 5; you can take a look through and tell us if

1   you recognize these documents.

2   A.  Yes, sir.  These are photographs of the room on that day.

3   Q.  Do you know when these photographs were taken?

4   A.  I believe they were taken shortly after his arrest.

5   Q.  Do they depict how that bedroom appeared the day that you

6   arrested Mr. Calix?

7   A.  Yes, sir.

8           MR. COOPER:  The government offers Government's

9   Exhibits 3, 4 and 5.

10          MS. BAUMGARTEL:  No objection.

11          THE COURT:  Exhibit 3, 4 and 5 admitted in evidence.

12          (Government's Exhibits 3, 4 and 5 received in

13  evidence)

14          THE COURT:  Go ahead.

15          MR. COOPER:  Thank you.

16  BY MR. COOPER:

17  Q.  If you can turn to Exhibit 3, can you describe for the

18  Court what this depicts?

19  A.  This is the room, there is a dresser, a dresser that I was

20  describing on the right-hand side, the TV in the back corner,

21  the bed and the dresser that was sort of the of in the middle

22  of the room, the nightstand.

23  Q.  Was that dresser in the middle of the room when you entered

24  the bedroom?

25  A.  Yes, sir.

1              THE COURT:  What dresser?  What exhibit are you

2      looking at?

3              THE WITNESS:  3, sir.

4              THE COURT:  Where is the dresser?

5              THE WITNESS:  In the middle next to the bed.

6              THE COURT:  All right.

7      BY MR. COOPER:

8      Q.  Can you please describe where you were positioned in the

9      room?

10     A.  I was in the back right-hand corner by the TV next to the

11     dresser on the right-hand side.

12     Q.  Would that be the top right-hand corner of Exhibit 3?

13     A.  Yes, sir.

14     Q.  Where was Agent Foto positioned?

15     A.  Agent Foto was positioned, if you look at Exhibit 5 he was

16     standing by this closet door -- yeah, this closet door on the

17     top center of the photograph.

18     Q.  So that would be Exhibit 5 in the top toward the center?

19     A.  Yes, sir.

20     Q.  Does Exhibit 5 also depict Mr. Calix' bedroom?

21     A.  Yes, sir.

22             THE COURT:  What about the door that is on the

23     right-hand side of the back wall?

24             THE WITNESS:  This door, I don't believe that actually

25     leads anywhere, I think it was nailed shut, sir.  It is sort of

1  behind this chair.

2          THE COURT:  I see.

3  BY MR. COOPER:

4  Q.  On Exhibit 5, the upper left-hand side, is this a door that

5  appears there?

6  A.  Yes, sir.  That's the entry door to the apartment and then

7  you can also see the --

8          THE COURT:  Which picture are you looking at?

9          THE WITNESS:  5, sir.

10          THE COURT:  Yes.

11          THE WITNESS:  In the top left-hand corner, the bedroom

12  door.

13          THE COURT:  Yes.

14          THE WITNESS:  And then you can actually also see the

15  front door to the apartment sort of at the very top where it

16  turns dark, I guess.

17          THE COURT:  What is the white panel that is next to

18  it?

19          THE WITNESS:  That is just -- this right here, sir?

20          THE COURT:  Yes.

21          THE WITNESS:  This is just a short wall and then the

22  closet door and then another wall and then that other --

23          THE COURT:  The closet door.

24          THE WITNESS:  This is the closet door here.

25          THE COURT:  Where is the door to the closet?

1          THE WITNESS:  It is actually opened.  The door is

2    open.

3          THE COURT:  Then what is the pace to the right of

4    that?

5          THE WITNESS:  Just another short wall, sir.  And then

6    that's the corner.

7          THE COURT:  Okay.

8    BY MR. COOPER:

9    Q.  Looking at the door in Government Exhibit 5, is that the

10   one that you and Agent Foto had come through?

11   A.  Yes, sir.

12   Q.  If you can turn to Government Exhibit 4, what is depicted

13   in that photograph?

14   A.  The bed, the TV, the dresser, the other dresser that's in

15   the middle of the room and you can also see on the floor there

16   what appears to be dye-stained money.

17   Q.  Just be sure you are looking at the right document; I am

18   talking about Exhibit 4 right now.

19   A.  I apologize, sir.

20   Q.  Quite all right.

21   A.  That's the bed and the contents, a shoe box, and then the

22   dye-stained money and some sneakers.

23   Q.  You mentioned a shoe box.  Was there a shoe box in the room

24   when you first entered?

25   A.  Yes, sir.

1            When I entered the room and walked to this back corner

2    and then turned around to cover Agent Foto as he was checking

3    the closet, as he opened the closet door I knocked over some

4    boxes that were in this corner.  And after Agent Foto had

5    checked that closet I looked down and I saw this dye-stained

6    money.

7    Q.  What else do you see when you are in the bedroom?

8    A.  I also saw what appeared to be a police scanner on top of

9    the dresser.

10   Q.  Did you later learn -- one moment, your Honor.

11            (Counsel conferring)

12   BY MR. COOPER:

13   Q.  You mentioned that you had knocked over a shoe box?

14   A.  Yes.

15   Q.  Was that an accident or did you intend to do that?

16   A.  No, sir.  I did it accidentally.

17   Q.  What else was going on at the time that you knocked over

18   that shoe box?

19   A.  I was turning to cover Agent Foto as he was checking that

20   closet.  When we entered the room the closet door was closed

21   and so Agent Foto signaled to me that there was a closet door.

22   So, I turned around once I got to the corner and then covered

23   him as he opened the closet door.

24   Q.  Agent Walsh, did you later learn that consent to search was

25   obtained from the defendant?

1    A.  Yes, I did.

2    Q.  At that time did you believe a search warrant could have

3    been obtained?

4    A.  Yes, sir.

5    Q.  Why?

6    A.  I had observed the police scanner and I also had seen the

7    money, the shoe box that I knocked over.

8    Q.  And it is just the money that appears in Government Exhibit

9    4?

10   A.  Yes, sir.

11   Q.  Did there come a time when Mr. Calix was taken from 506

12   West 151st Street?

13   A.  Yes, sir.

14   Q.  Prior to that point had you said anything to Mr. Calix at

15   506 West 151st Street?

16   A.  Other than "Get down on the ground," no, sir.

17   Q.  Did you see Mr. Calix later that day?

18   A.  Yes, sir.

19   Q.  Where?

20   A.  In post-arrest processing taking fingerprints, and then

21   again I escorted him to the marshals with Agent Floyd.

22          THE COURT:  What about in the apartment?  Did you see

23   him after?

24          THE WITNESS:  No, sir.  Once we had checked that room

25   I left because there was a security system in the kitchen on

1    that apartment that had, like, a screen that had the lobby

2    video cameras and I was talking with Agent Wheeler and the

3    tenant who only spoke Spanish to try to get permission to copy

4    the security camera footage.

5    BY MR. COOPER:

6    Q.  Did you say anything to Mr. Calix later that day?

7    A.  I spoke to him when we were processing, taking

8    fingerprints.  I think I asked him where he lived, height,

9    weight, pedigree-type information.

10   Q.  Where was this?

11   A.  At 26 Federal Plaza, sir.

12   Q.  And why did you ask those questions?

13   A.  It is standard procedure for processing.

14          MR. COOPER:  One moment, please, your Honor?

15          (Counsel conferring)

16   BY MR. COOPER:

17   Q.  Going back to the arrest of Mr. Calix.  When you first

18   encountered him, how long did that take?

19   A.  A few seconds.  He was standing there right inside the door

20   and we were able to -- I actually didn't handcuff him myself,

21   actually Agent Foto and I just pulled him to the ground and

22   stepped over him to enter the room.

23          MR. COOPER:  Thank you.

24          No further questions, your Honor.

25          THE COURT:  Cross-examination.

1    CROSS EXAMINATION

2    BY MS. BAUMGARTEL:

3    Q.  Good afternoon, Agent Walsh.

4    A.  Good afternoon, ma'am.

5    Q.  Do you still have the government's exhibits in front of

6    you?

7    A.  Yes, ma'am.

8    Q.  When you broke into the apartment where was Mr. Calix?

9    Perhaps you could show us or tell us on Government Exhibit 5.

10   A.  He was standing -- I know it is hard to see because of the

11   angle of the photo, but in the space behind this dresser that

12   is like in the middle of the room next to the bed.

13   Q.  So maybe let's try Exhibit 3 then.

14           So, he was basically -- he was standing -- if you look

15   at Exhibit 3 maybe where the sneaker is, that area?

16   A.  No, ma'am.  Sort of in the space like in front of the

17   closet in Exhibit 5 there is that, the door to the apartment,

18   the short wall, and then the closet.

19   Q.  Yes.

20   A.  Sort of in that region right there, ma'am.

21   Q.  So would that be sort of in front of where this white

22   thing, the -- what is that in the center there?  Is that an air

23   conditioning unit?  Do you know what that is?

24   A.  I don't, ma'am.

25           THE COURT:  Heater.

E2A5calH                    Walsh - cross

1    Q.  A heater?

2            THE COURT:  Or air conditioner.

3    Q.  Where was he in relation to that?

4    A.  Behind it, ma'am, between that and the closet.

5    Q.  So, he was closer to the closet and further away from the

6    bed; is that right?

7    A.  Yes, ma'am.  It is safe to say.

8    Q.  And so as soon as you forcibly opened the door, you were

9    able to basically pull him forward and was he out of the room

10   at that time?

11   A.  No.  He was actually on the floor like in the entry way of

12   the bedroom.

13   Q.  Okay.

14           And he was put immediately down on the ground and then

15   you moved into the apartment; is that right?

16   A.  Myself and Agent Foto, yes, ma'am, to opposite corners.

17   Q.  And as you were doing that you knocked something over,

18   right?

19   A.  Yes, ma'am; a couple of boxes in this back corner.

20   Q.  So there wasn't dye-stained money on the ground when you

21   first came in, right?

22   A.  No, ma'am.  Well -- no.  Those boxes were in the corner and

23   I knocked them over after I checked that corner.

24   Q.  And you were checking to see if there was anybody else in

25   the apartment, right?

1    A.  Yes, ma'am.

2    Q.  And you and Agent Foto quickly confirmed that there was

3    not, right?

4    A.  Yes, ma'am.

5    Q.  Now, you said that you would come into the building through

6    a back door.  Did anyone let you into the back door?

7    A.  It was already open when I got there.

8    Q.  When you say opened or physically --

9    A.  No, it was physically opened.

10   Q.  Is it a door -- is this a residential apartment building?

11   A.  I believe it is; yes, ma'am.

12   Q.  Do you know about how many apartments there are inside?

13   A.  I don't, ma'am.  I never went outside the first floor or

14   above the first floor.

15   Q.  Did you actually get the security camera footage?

16   A.  I believe we did, yes, ma'am.  I didn't do it myself but

17   someone who works for the FBI did.

18   Q.  And did that security camera footage show the apartment

19   from that day?

20   A.  I never reviewed the video myself, ma'am.

21   Q.  From your conversation with Agent Wheeler and the tenant,

22   did you have any understanding of what the security footage

23   would show?

24   A.  I could actually see when he was in the apartment, I could

25   see that there was like a lobby.  I think maybe in the back

E2A5calH                     Walsh - cross

 1  there was a view of the back of the building but I could tell

 2  that one was clearly the lobby of the building which is why we

 3  went about trying to get it.

 4  Q.  Did you participate in the search of Mr. Calix' bedroom?

 5  A.  No, ma'am.

 6  Q.  Which agents participated in that search?  Do you know?

 7  A.  I couldn't tell you exactly, ma'am, because I left with

 8  Mr. Calix and I followed Mr. Calix, Agent Foto and the

 9  detective.

10  Q.  So, about how long were you at the apartment that morning

11  after Mr. Calix' arrest?

12  A.  I couldn't tell you, ma'am.  Maybe a half hour, maximum.

13  Q.  And so you think it was about a half hour from the time of

14  his arrest until he was transported down or away from the

15  apartment?

16  A.  No.  I would say it is probably a half hour from the time

17  that we got to that area until we left.

18  Q.  So this all happened very quickly; is that right?

19  A.  Once we went into that building; yes, ma'am.

20  Q.  Now, when you first went into the apartment there was not a

21  gun visible, right?

22  A.  No, ma'am.

23  Q.  And in fact you never saw a gun in the apartment, right?

24  A.  I did not.  No, ma'am.

25  Q.  And you never heard Mr. Calix make any statements; is that

1    right?

2    A.   No, ma'am.  I did not.  Other than telling me his name and

3    height, weight.

4    Q.   Do you recall when you took that pedigree information?

5    A.   I don't know exactly what time, ma'am.

6    Q.   Do you know if it was before or after Mr. Calix was

7    interviewed by other agents?

8    A.   It was after, ma'am.

9            MS. BAUMGARTEL:  I have no further questions.

10            THE COURT:  Redirect.

11   REDIRECT EXAMINATION

12   BY MR. COOPER:

13   Q.   Agent Walsh, on cross-examination you testified about

14   following in the car behind Mr. Calix when he was transported

15   from the apartment building where he had been arrested.

16            Do you recall that?

17   A.   Yes.

18   Q.   Who was transporting Mr. Calix?

19   A.   Agent Foto and Detective Fishstein.

20   Q.   Was Agent Floyd involved in the transfer?

21   A.   I apologize, sir.  It is Agent Floyd, not Agent Foto.

22   Q.   So who was in the car transporting Mr. Calix?

23   A.   Agent Floyd and Detective Fishstein.

24            MR. COOPER:  Thank you.

25            No further questions, your Honor.

1           THE COURT:  Next witness.

2           Thank you.

3           THE WITNESS:  Thank you, your Honor.

4           MR. COOPER:  The government calls Benjamin Langel.

5     BENJAMIN LANGEL,

6           called as a witness by the Government,

7           having been duly sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MR. COOPER:

10    Q.  How long have you been a special agent with the FBI?

11    A.  I have been a special agent with the FBI for a little over

12    eight years.

13    Q.  I'm sorry?

14    A.  A little over eight years.

15    Q.  What is your current assignment?

16    A.  I'm currently assigned to Squad C-19 which is a violent

17    crime squad.  We work mostly bank robberies, armored car

18    robberies and other violent crimes.

19    Q.  How long have you been assigned to that squad?

20    A.  I have been assigned to this squad since December of 2010.

21    Q.  Before that what was your assignment?

22    A.  Before that I was assigned to a squad which investigated

23    health care fraud -- primarily medicare and private insurance

24    fraud.

25    Q.  Prior to joining the FBI, where did you work?

1    A.   Before the FBI I was a United States Postal Inspector for

2    two years in California and before that I was a police officer

3    for about five years in the State of Missouri.

4    Q.   In your law enforcement career approximately how many

5    searches of residences have you conducted?

6    A.   I don't know the exact number but well over a dozen.

7    Q.   Directing your attention to July 18, 2013, were you

8    involved in the arrest of Andre Calix that day?

9    A.   Yes, I was.

10   Q.   Where did that arrest take place?

11   A.   It took place at an address in Manhattan.  I don't know of

12   the specific address but it was on 106th or 115th?  I don't

13   remember the exact address.

14   Q.   Okay.  With respect to the address that you did arrest

15   Mr. Calix at, did there come a time when you and the other law

16   enforcement officers went inside one of the apartments at that

17   address?

18   A.   Yes, there was.

19   Q.   Where was that apartment?

20   A.   That apartment was located -- I'm sorry.  That apartment

21   was located on the first floor of a residence.

22   Q.   Can you describe what happened when you got to that

23   apartment?

24   A.   Yes.

25        Myself and another agent made contact with a woman

 1    there.  We showed a photo to her -- of Mr. Calix to the woman.

 2    She did not speak English, she spoke Spanish.  I do not speak

 3    Spanish.  We waited until another Spanish-speaking agent

 4    arrived and she indicated -- it is my understanding that she

 5    indicated to the Spanish speaking agent that Mr. Calix lived in

 6    one of the apartments inside this apartment.  The apartment had

 7    been divided into several rooms which were being rented

 8    individually and Mr. Calix was renting one of those rooms.

 9    Q.  What happened next?

10    A.  One of the agents forced that door open.  Mr. Calix was

11    standing inside and he was taken into custody, he was taken to

12    the ground.  I believe he was approximately halfway in and

13    halfway out, it was right at the threshold of the apartment so

14    his legs were inside the apartment and his torso was outside

15    the apartment.

16    Q.  What was Mr. Calix wearing at that point?

17    A.  Mr. Calix was wearing clothes that you would sleep in.  I

18    don't remember what color it was but he was wearing either a

19    t-shirt or a tank top and he was wearing shorts.  It looked

20    like clothing that one would sleep in.  It was early in the

21    morning and I believe we probably woke him up or he probably

22    woke up once he heard the commotion outside his room.

23              THE COURT:  Please keep your voice up.

24              THE WITNESS:  Yes, your Honor.

25    BY MR. COOPER:

1   Q.  What happened next?

2   A.  One of the agents asked Mr. Calix his name and he gave us a

3   fictitious name.  I don't remember the specific name that he

4   gave but I said to Mr. Calix something to the effect of, *Andre,*

5   *we know who you are.  It is over.*  And he didn't say anything

6   but he just kind of looked at me, didn't make a statement to

7   that.

8   Q.  Was Mr. Calix moved anywhere?

9   A.  Yes.  By this point he had been handcuffed.  He had been

10  moved to the hallway or the lobby of the building right outside

11  the apartment and was seated on the floor.  If you were to walk

12  out and make a left he was seated on the floor in the lobby.

13  Q.  Did there come a time when Mr. Calix was asked to consent

14  to a search of his bedroom?

15  A.  Yes.  He was.

16  Q.  Who was speaking with Mr. Calix about that?

17  A.  Special Agent Jason Floyd.

18  Q.  Where were you during that discussion?

19  A.  I was in the lobby there as well.

20  Q.  With your near Agent Floyd?

21  A.  I was.  I believe Agent Floyd kneeled down next to

22  Mr. Calix.  I squatted down so I lowered myself to that level.

23  I believe Detective Mark Fishstein and Detective Mike Dorto

24  from the NYPD and were also in the lobby at that time.

25  Q.  Those two detectives, Detective Fishstein and Detective

1    Dorto, were they located immediately in front of Mr. Calix?

2    A.  As far as I recall, yes, they were standing in front of

3    him.

4    Q.  About how far away from him were they?

5    A.  A little bit further back.  They weren't standing over him,

6    they were standing back a little bit further away and Special

7    Agent Jason Floyd was kneeling down next to Mr. Calix and I was

8    squatting down next to Mr. Calix.

9    Q.  Can you please describe Mr. Calix' demeanor when he was

10   first moved to the lobby area?

11   A.  When we brought him out he was sweating profusely.  It was

12   a warm day, it was July, but he was sweating more than -- he

13   was sweating profusely.  He started breathing very heavily

14   almost like he was hyperventilating at one point and he was --

15   I remember him being non-verbal.  We were talking to him and he

16   wasn't responding to our requests and he was kind of staring

17   straight ahead.  He eventually calmed down his breathing and

18   returned to normal during the course of Agent Floyd talking to

19   him.

20   Q.  What, if anything, did you say to Mr. Calix during this

21   conversation?

22   A.  Special Agent Floyd had asked Mr. Calix several times if he

23   would give us consent to search his apartment and Mr. Calix

24   wasn't answering.  And at one point I said something to the

25   effect of if you are not willing to sign consent we are going

1    to get a search warrant or we are going to ask a Judge for a

2    search warrant.  And Special Agent Floyd asked him again after

3    that:  Will you give us consent?  And Mr. Calix eventually gave

4    us consent to search his apartment.

5    Q.   Did you believe that you would be able to apply for a

6    search for Mr. Calix' bedroom at that point?

7    A.   Yes, I did.

8    Q.   Why did you believe that?

9    A.   From my training and experience -- I have investigated a

10   number of bank robberies -- we arrested him inside the

11   apartment.  One of the -- the lady that spoke Spanish and spoke

12   to another agent told us that he was wrecking that apartment

13   and it has been my experience that bank robbers typically keep

14   both proceeds of bank robbery, as well as bank robberies in the

15   past we have found firearms, demands notes, clothing that

16   robbers have worn during bank robberies inside their apartment.

17   So, yes, I believe we could have asked for a search warrant.

18            THE COURT:  Did you have prior evidence of this man's

19   involvement in any bank robberies?

20            THE WITNESS:  Yes.  It was my understanding that we

21   had a warrant for his arrest at that time for bank robbery.

22   BY MR. COOPER:

23   Q.   You mentioned a consent to search that was discussed with

24   Mr. Calix.  Did there come a time when Agent Floyd went to get

25   a consent to search form?

E2A5calH                    Langel - direct

1    A.  Yes.  He -- I don't remember if he got the form himself or

2    if someone brought him the form, but he actually did have the

3    physical form and asked Mr. Calix to sign that form.

4    Q.  Do you recall whether Agent Floyd left the building to get

5    the form?

6              MS. BAUMGARTEL:  Objection, your Honor, to the

7    leading.

8              MR. COOPER:  I can rephrase, your Honor.

9              THE COURT:  Rephrase.

10   BY MR. COOPER:

11   Q.  Was Mr. Calix present in the lobby throughout these events?

12   A.  Yes, he was.

13   Q.  What was your tone of voice when you were having this --

14   when you said these things to Agent Floyd?

15   A.  When Agent Floyd was speaking to Mr. Calix, when he spoke

16   to Mr. Calix, his tone of voice was very calm, very

17   conversational.  It was not accusatory or was not -- it was a

18   very calm tone of voice.

19   Q.  And just to be clear about my prior questioning, was Agent

20   Floyd present with the defendant throughout the entire time?

21   A.  That I am not certain.  I know there were law enforcement

22   personnel that were with him all the time but I do not remember

23   if it was Agent Floyd that went to get the paperwork or if

24   another agent went and got that and brought it to him.  I don't

25   remember.

1   Q.   Did somebody go outside to get the paperwork?

2   A.   Someone did because he had the form.

3   Q.   During that period when someone went outside to get the

4   form, where were you?

5   A.   I was with Mr. Calix.

6   Q.   During that period of time we are discussing did you say

7   anything to Mr. Calix?  This is the period of time when

8   somebody went to get the consent form.

9   A.   I don't remember specifically what I said other than

10  telling him at one point that if he wouldn't sign the consent

11  but we would ask the Judge for a search warrant.  But, if I did

12  have any conversation with him I don't recall specifically what

13  it was.

14  Q.   Did there come a time when Mr. Calix was taken from that

15  building where he was arrested?

16  A.   Yes.

17  Q.   Aside from what you already testified to at the building

18  where he was arrested, did you say anything else to Mr. Calix?

19  A.   Not that I recall.  No.

20  Q.   Were you with Mr. Calix when he was transported from 506

21  West 151st Street?

22  A.   I was not.

23  Q.   Did you say anything that day to Mr. Calix after he was

24  transported?

25  A.   No, I did not.  Once he left the building I did not have

 1    any conversations with him.

 2                MR. COOPER:  Thank you.  No further questions, your

 3    Honor.

 4                THE COURT:  All right.  Cross-examination.

 5    CROSS EXAMINATION

 6    BY MS. BAUMGARTEL:

 7    Q.  Good afternoon, Agent Langel.

 8    A.  Good afternoon.

 9    Q.  So you were not with Mr. Calix at any point after he was

10    taken from the side of the building where he was arrested; is

11    that right?

12    A.  That's correct.  That's correct.

13    Q.  Mr. Calix was visibly upset when he was arrested, right?

14    A.  Yes, he was.

15    Q.  He was sweating and breathing very heavily, right?

16    A.  He was.

17    Q.  He seemed like he might be hyperventilating; is that

18    correct?

19    A.  He was.

20    Q.  And he almost fainted at one point, right?

21    A.  I don't remember that but I do remember him

22    hyperventilating or seeming very upset.

23    Q.  And that is part of why he was sitting down while he was

24    out in the lobby, right?

25    A.  Correct.  Yes.

1   Q.   And when he was out in the lobby there were several agents

2   around him, right?

3   A.   There were.

4   Q.   There were two agents standing by and then I think you said

5   you and Agent Floyd were sort of crouching down near him?

6   A.   There were a few detectives standing in the lobby further

7   back and two of us were crouching next to him, yes.

8   Q.   And Agent Floyd was speaking to him about the consent to

9   search; is that right?

10  A.   Correct.

11  Q.   And I think you said, tell me if this is correct, Agent

12  Floyd asked him to sign it several times?

13  A.   He did.

14  Q.   And Mr. Calix didn't initially agree?

15  A.   He initially didn't -- he didn't disagree, he just wasn't

16  responding to the agent's questions.

17  Q.   So what questions was Mr. Calix being asked?

18  A.   As I recall, he was asked:  Do you give us consent to

19  search your apartment?  And I remember him being asked that

20  several times.

21  Q.   He was asked other questions before that too, right?

22  A.   Not that I recall.

23  Q.   He was asked his name, right?

24  A.   He was asked his name.

25  Q.   Was he asked other pedigree information?

1   A.  I'm not saying he wasn't, I don't remember that.  I do

2   remember him being asked his name.  He gave us a fictitious

3   name and he was asked for consent but we didn't question him,

4   we asked him basic questions.

5   Q.  Did anybody ask if he had anything in the apartment?

6   A.  I believe somebody may have asked if there were any weapons

7   in the apartment.

8   Q.  And did they ask if there was anybody else in the

9   apartment?

10  A.  That I don't remember but it was a very small room so I

11  don't know that it was and I don't recall.

12          THE COURT:  Did he respond to those questions?

13          THE WITNESS:  I don't remember him responding to them,

14  your Honor.

15          THE COURT:  On the name you earlier testified that you

16  said something and he gave you --

17          THE WITNESS:  When we initially asked him who are you

18  and what is your name he gave us a fictitious name.  And we

19  recognized him from the photo -- or at least I recognized him

20  from the photo and that's when I said to him:  *Look.  Andre, we*

21  *know it is you*.  After that he became very unresponsive.

22          So -- I'm sorry.  To clarify, he initially did give us

23  his name but after that he became very nonresponsive to our

24  questions.

25  BY MS. BAUMGARTEL:

E2A5calH                    Langel - cross

1    Q.  So there was a period of time where he was totally

2    nonresponsive basically?

3    A.  Yes.

4    Q.  And that was as Agent Floyd was continuing to talk to him,

5    right?

6    A.  Yes.  He seemed to calm down.  After he realized what was

7    going on he seemed to calm down but initially he was

8    hyperventilating and was nonresponsive.

9    Q.  So what was Agent Floyd saying to him?

10   A.  I remember him asking --

11          THE COURT:  When?  When are you asking?

12   Q.  As he was calming down while sitting in the lobby.

13   A.  I don't remember specifically.  I believe I may have said,

14   like, everything is fine, calm down.  We would like to search

15   your apartment.  Would you be willing to give us consent to

16   search your apartment?

17   Q.  And he repeated that question several times, right?

18   A.  He did.

19   Q.  And Mr. Calix did not respond?

20   A.  Not initially.

21   Q.  And finally you said we are going to go to a Judge and get

22   a warrant if you don't agree; right?

23   A.  I believe at that point we had probable cause to get a

24   warrant.  So, I stated that to Mr. Calix, if you are not

25   willing to give us consent we are going to ask a Judge for a

warrant something to that effect.  I don't remember my exact

words.

Q.  At that point you hadn't searched the apartment at all,

right?

A.  Correct.

Q.  You hadn't found a gun in the apartment, right?

A.  No.

Q.  You hadn't found any marked money in the apartment, right?

A.  I had not gone into the apartment, I was in the hallway,

so.

Q.  Now, you said earlier that there was a conversation with

the landlord of the apartment.  You personally didn't speak to

her, right?

A.  Yes.  Initially I spoke to her with another agent, I don't

remember who was with me.  She did not speak English so I -- we

had a Spanish-speaking agent with us who was not -- was not

there at the time, she was -- we had initially gone to the

building adjacent, I believe she was over there.  I called the

Spanish-speaking agent that I knew to see if I could have her

translate with this woman and in that course of time the

Spanish-speaking agent came and spoke to the woman that lived

there.

Q.  And -- withdrawn.

          So you didn't participate in the search of Mr. Calix'

room at any point; is that correct?

1    A.  I did not.

2    Q.  Do you have any knowledge as to where items in the room

3    were found?

4    A.  No.  I don't recall where they were found.  I believe the

5    gun may have been hidden but I believe one of the agents may

6    have said that they found the gun hidden in the mattress or

7    under the bed but I don't recall specifically.

8    Q.  As best you can recall, the agent who found the gun said it

9    was hidden in the mattress, is that right?

10   A.  Hidden in the mattress or under the bed in the bedroom.

11   Q.  And Mr. Calix never told you where the gun was, right?

12   A.  No.  No.

13            MS. BAUMGARTEL:  Nothing further, your Honor.

14            THE COURT:  Any redirect?

15   REDIRECT EXAMINATION

16   BY MR. COOPER:

17   Q.  Thank you, your Honor.

18            Agent Langel, how long did it take Mr. Calix to calm

19   down from the point where he was sweating and breathing heavily

20   and hyperventilating?

21   A.  It was just a few moments, a few minutes.  Not more than

22   five, probably.

23   Q.  And what was Mr. Calix' demeanor after that point?

24   A.  Calm.  I would categorize it as resigned like when someone

25   realized that they had been caught.

1          MR. COOPER:  One moment, please, your Honor.

2          (counsel conferring)

3    BY MR. COOPER:

4    Q.  And after that point, after Mr. Calix had calmed down and

5    appeared to you to be resigned, what did Agent Floyd ask him?

6    A.  He asked him again if he would give consent to search and

7    he said that he would or indicated that he would.

8          THE COURT:  Was the form read to him at all in that

9    time?

10         THE WITNESS:  I believe that it was, your Honor, but I

11   don't remember for certain.  I know that at one point Agent

12   Floyd asked Mr. Calix if he was left-handed or right-handed and

13   we removed the handcuff from that wrist so that he could sign

14   the form.

15   BY MR. COOPER:

16   Q.  At what point did Mr. Calix sign the form in relation to

17   the events that we are discussing?

18   A.  After we had been outside of his apartment for a few

19   minutes.

20   Q.  Was that before or after Mr. Calix had calmed down?

21   A.  It was after he had calmed down.  By this point his

22   breathing had slowed and he was calmer than he had been

23   earlier.

24         MR. COOPER:  Thank you very much.  No further

25   questions, your Honor.

1              THE COURT:  All right.

2              Next witness.

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  I have a problem.  I have to go to Judge

5      Leisure's memorial service so how many more witnesses do we

6      have?

7              MR. COOPER:  We have one more witness, your Honor.

8              THE COURT:  I have to go to that service, I will come

9      back for it.

10             MR. COOPER:  We can come back on another date for the

11     final witness.

12             THE COURT:  I can come back after the service, it is

13     usually a half hour or more starting at 4:00, maybe 45 minutes,

14     something like that.

15             MR. COOPER:  We think we can pick a new date and come

16     back for the final witness.

17             THE DEPUTY CLERK:  Does tomorrow work?

18             MR. COOPER:  Tomorrow morning would work for the

19     government.

20             MS. BAUMGARTEL:  Your Honor, I'm sorry.  I'm not

21     available any time tomorrow.  The Court is closed on Wednesday.

22     I could be available sometime on Thursday.

23             THE DEPUTY CLERK:  Friday?

24             MS. BAUMGARTEL:  Or Friday.

25             THE DEPUTY CLERK:  Friday, 9:30.

1          THE COURT:  Is there a problem with Thursday?

2          THE DEPUTY CLERK:  Yes.  You are picking a jury.

3          THE COURT:  We have to pick a jury Thursday.

4          MS. BAUMGARTEL:  9:30.

5          MR. COOPER:  Unfortunately the government won't be

6     able to do Friday.

7          THE COURT:  What about Thursday afternoon?

8          MS. BAUMGARTEL:  Thursday afternoon I can be here.

9          THE DEPUTY CLERK:  At 4:00?  4:00 on Thursday?

10          MR. O'DONNELL:  It is my fault, your Honor.  I'm out

11     Thursday and Friday but somebody else can cover.  If you prefer

12     to do it on Friday or Thursday, that's fine, otherwise next

13     week would be better for me.

14          THE COURT:  I think you would want to get this over

15     while witnesses are gathered.

16          THE DEPUTY CLERK:  Friday at 9:30?

17          MR. COOPER:  That's fine for the government.  Thank

18     you.

19          MS. BAUMGARTEL:  Fine.  Thank you.

20          THE COURT:  All right.  Thank you very much.

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    JASON FLOYD

4    Direct By Mr. Cooper . . . . . . . . . . . . . . 3

5    Cross By Ms. Baumgartel . . . . . . . . . . .23

6    Redirect By Mr. Cooper . . . . . . . . . . . .44

7    COREY WALSH

8    Direct By Mr. Cooper . . . . . . . . . . . . . .45

9    Cross By Ms. Baumgartel . . . . . . . . . . .56

10   Redirect By Mr. Cooper . . . . . . . . . . . .60

11   BENJAMIN LANGEL

12   Direct By Mr. Cooper . . . . . . . . . . . . . .61

13   Cross By Ms. Baumgartel . . . . . . . . . . .69

14   Redirect By Mr. Cooper . . . . . . . . . . . .74

15                    GOVERNMENT EXHIBITS

16   Exhibit No.                          Received

17    1   . . . . . . . . . . . . . . . . . . . . .11

18    2   . . . . . . . . . . . . . . . . . . . . .20

19    3, 4 and 5   . . . . . . . . . . . . . . . .49

20

21

22

23

24

25