E2KKCAL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                       13 CR 582 (RPP)

ANDRE CALIX,

          Defendant.

------------------------------x

                             New York, N.Y.
                             February 20, 2014
                             4:35 p.m.

Before:

                HON. ROBERT P. PATTERSON, JR.,

                             District Judge

                        APPEARANCES

PREET BHARARA,
     United States Attorney for the
     Southern District of New York
RICHARD ALAN COOPER
JOHN O'DONNELL
     Assistant United States Attorney

SARAH BAUMGARTEL
     Attorney for Defendant

E2KKCAL1

1          THE DEPUTY CLERK:  United States versus Andre Calix.

2     Is the government ready?

3          MR. COOPER:  Yes.  Good afternoon, your Honor.

4     Richard Cooper and John O'Donnell for the government.

5          THE COURT:  Good afternoon.

6          MS. BAUMGARTEL:  Good afternoon.  Sarah Baumgartel for

7     the Federal Defenders on behalf of Mr. Calix.

8          THE COURT:  Good afternoon, Ms. Baumgartel, and good

9     afternoon, Mr. Calix.

10          THE DEFENDANT:  Good afternoon.

11          THE COURT:  Do you need an interpreter here or not?

12          MS. BAUMGARTEL:  No, your Honor.

13          THE DEPUTY CLERK:  Judge, I think I have to swear in

14     the witness.

15          THE COURT:  Are you calling a witness?

16      MARK FISHSTEIN,

17          called as a witness by the Government,

18          having been duly sworn, testified as follows:

19          THE DEPUTY CLERK:  Please state state your name and

20     spell your first and your last name slowly for the record,

21     please.

22          THE WITNESS:  Detective Mark Fishstein, M-a-r-k

23     F-i-s-h-s-t-e-i-n, Shield No. 2352.

24          MR. COOPER:  May I proceed, your Honor?

25          THE COURT:  Yes.

E2KKCAL1

1    DIRECT EXAMINATION

2    BY MR. COOPER:

3    Q.   Where are you employed?

4    A.   The New York City Police Department.

5    Q.   And what is your position there?

6    A.   I'm a detective in the major case squad.

7    Q.   How long have you been a detective with the New York City

8    Police Department?

9    A.   Approximately 14 years.  13 years, I'm sorry.

10   Q.   Prior to becoming a detective, what did you do?

11   A.   I was a patrol officer in the 17th Precinct.

12   Q.   Is that with the NYPD?

13   A.   Yes.

14   Q.   How long were you a patrol officer?

15   A.   Approximately seven years.

16   Q.   Prior to that, where were you employed?

17   A.   I worked for a jewelry manufacturer called Peter

18   Admon, Inc.

19   Q.   With respect to your current assignment as a detective with

20   the major case squad, what are your responsibilities?

21   A.   In the major case squad, we investigate bank robberies,

22   kidnappings, high-end commercial burglaries, and I am the NYPD

23   art theft expert.

24   Q.   How many bank robbery investigations have you conducted in

25   the course of your career?

1   A.  Well over a hundred.

2   Q.  How many searches have you been involved in in your career?

3   A.  Again, well over a hundred.

4   Q.  How many times have you conducted postarrest interviews in

5   your career?

6   A.  Well over a hundred.

7   Q.  Directing your attention to July 18th, 2013, were you

8   involved in the arrest of Andre Calix that day?

9   A.  Yes.

10  Q.  Where did the arrest take place?

11  A.  Inside of 506 West 151 in Manhattan.

12  Q.  How did you get into that address?

13  A.  It's an apartment building.  We entered through the front

14  door.

15  Q.  In your experience as a detective and a police officer

16  before that, is it common for officers to be given entry to

17  common areas of buildings?

18          MS. BAUMGARTEL:  Objection; relevance.

19          MR. COOPER:  Your Honor, this is an area the defense

20  counsel inquired into in cross-examination last time.

21          MS. BAUMGARTEL:  Your Honor, the witness didn't

22  testify he was given entry.  He didn't say that he recalled

23  that.

24          THE COURT:  Well, which witness?

25          MS. BAUMGARTEL:  This witness, your Honor.

1              THE COURT:  This witness?

2              Objection sustained.

3    Q.  Detective Fishstein, did you develop an understanding at

4    any point in time of how you gained entry to that address?

5              MS. BAUMGARTEL:  Objection, your Honor.  This was

6    already answered by the witness.

7              THE COURT:  I'm going to allow the question.

8              THE WITNESS:  Could you repeat it, please, sir?

9    Q.  Did you develop an understanding of how entry was gained

10   into that building?

11   A.  It was my understanding that the door was opened and we

12   entered.

13             THE COURT:  Which door was that?

14             THE WITNESS:  The door from the street into the

15   vestibule and from the vestibule into the lobby.

16   Q.  In your experience with the NYPD, is it common for officers

17   to enter common spaces of buildings such as what happened with

18   respect to this address on July 18th, 2013?

19   A.  Yes.

20   Q.  Now, did there come a time when you -- withdrawn.

21             Approximately what time did you arrive at that

22   address?

23   A.  Between 7:30 a.m. and 8:00 p.m -- 8:00 a.m.

24   Q.  Who were you with?

25   A.  I was with one of my partners, Detective Michael Dordo, and

1   there was a team of FBI agents that we accompanied there.

2   Q.  Did there come a time when you and the agents went inside

3   one of the apartments in that building?

4   A.  Yes.

5   Q.  Which apartment?

6   A.  It was the first apartment inside the lobby of the building

7   immediately on your left as you entered.

8   Q.  Can you describe for the Court the layout of the entryway

9   in the lobby of that building?

10  A.  Yes.  Once you walked up -- there are several stairs to the

11  landing.  There was a glass door.  You opened that door, there

12  was another door.  Once you passed that door, you were in the

13  lobby of the building.  I believe that there were mailboxes on

14  the right, and on the left was the first apartment door.

15  Q.  Can you please describe what happened with respect to that

16  first apartment on the left?

17  A.  Yes.  One of the agents knocked on the door.  The door was

18  answered by a Hispanic female, middle-aged.  I don't think she

19  spoke English because the agent spoke to her in Spanish --

20          THE COURT:  Is this on the same floor as the lobby?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  All right.

23          THE WITNESS:  Ground floor for all intents and

24  purposes.

25          She was shown a wanted poster that had Mr. Calix's

E2KKCAL1                    Fishstein - direct

1  image on it, and she pointed over her shoulder to the door

2  immediately behind her, which was a bedroom door.

3           THE COURT:  This is what you saw?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  All right.

6  Q.  What happened next?

7  A.  The agents asked her to step out of the apartment, and they

8  prepared to knock on the door.  My partner and I stayed back in

9  the lobby area because it was very tight area there, there was

10  too many people and it would create an unsafe condition if

11  there were so many of us there.  So we let the agents make the

12  entry.  They did so --

13           THE COURT:  Well, now how could she step outside the

14  apartment?  I think you said the agents asked her to step out

15  of the apartment.  She wasn't in the apartment, was she?

16           THE WITNESS:  The apartment, as I came to later learn,

17  was subdivided into several different -- many bedrooms or

18  multiple bedrooms, where people I guess rented rooms.

19           THE COURT:  I see.  So she was inside?

20           THE WITNESS:  She was --

21           THE COURT:  She went in with you?

22           THE WITNESS:  No, no.  She, meaning the occupant --

23  that's who I'm talking about -- the lady that answered the

24  door.

25           THE COURT:  I see.  Answered the apartment door?

1        THE WITNESS:  Yes.

2        THE COURT:  OK.  All right, I get the picture.

3   Q.  So with respect to the apartment door, inside the apartment

4   door, could you please describe what the layout of the

5   apartment was?

6   A.  What I could see at that time was that immediately behind

7   the main entry door to the apartment was another door, and it

8   wasn't far behind, it was only the width of the hallway.  So

9   she was standing in the doorway of the apartment door but kind

10  of blocking the entry door to what we later learned was

11  Mr. Calix's room.

12  Q.  The door that the woman was pointing to, is that the door

13  to what you later learned was Mr. Calix's room?

14  A.  Yes, sir.

15  Q.  And was that room inside of the apartment on the first

16  floor of the building?

17  A.  Yes.

18  Q.  You mentioned earlier that agents went into that bedroom.

19  What were you able to observe when that happened?

20  A.  Someone was in the room laying down.  They escorted that

21  person out towards where we were, and I saw that it was

22  Mr. Calix.

23  Q.  What, if anything, did you say to Mr. Calix at that point?

24  A.  I said, you're Andre Calix.

25  Q.  How did he respond?

1  A.  He said, no, I'm not.  And he gave another name, which I

2  don't recall.  But I said, no, I recognize you, you're Andre

3  Calix.

4  Q.  Was the name that he gave you Andre Calix?

5  A.  No.

6  Q.  Did there come a point in time when Mr. Calix was moved

7  from that location?

8  A.  Out of the apartment?

9  Q.  Yes.

10  A.  Yes.

11  Q.  Where was he moved to?

12  A.  After he was handcuffed, they took -- the agents escorted

13  him out of the apartment and into the lobby area of the

14  building, and he was asked to sit on the floor in the corner.

15  Q.  Did there come a time when Mr. Calix was asked if he would

16  consent to a search of the room where he had been arrested, his

17  bedroom?

18        THE COURT:  I think you're leading, so let's just ask

19  the witness what happened.

20  Q.  What happened next?

21  A.  Eventually a consent form -- a consent was obtained by one

22  of the agents.  I was not present for that, though.

23        (Continued on next page)

24

25

1   BY MR. COOPER:

2   Q.  After Mr. Calix was brought out into the lobby of the

3   apartment building, what did you see?

4   A.  There were several -- there were several of us that watched

5   Mr. Calix.  Some agents went outside.  Eventually someone took

6   over for me and I went outside.  I needed to make several

7   necessary phone calls to notify my supervisors that we had

8   apprehended Mr. Calix.

9   Q.  Now prior to your stepping outside, did you say anything to

10  Mr. Calix?

11  A.  No, not at that time.

12  Q.  Did you hear any of the other agents or law enforcement

13  officers say anything to Mr. Calix?

14  A.  Not that I recall, no.

15  Q.  You said that "there were several of us in the hallway"

16  when Mr. Calix was seated there in the lobby.  How many law

17  enforcement officers do you recall being present when Mr. Calix

18  was seated in the lobby of the building?

19  A.  I can't give you a number.  I don't recall.

20  Q.  Where were you positioned with respect to Mr. Calix?

21  A.  I was facing him.  I was -- I was watching him.  At some

22  point Agent Langel was also there with me watching him.  There

23  came a time a few minutes later where I said to Agent Langel,

24  "I need to go outside and make a few phone calls to let my

25  bosses know what happened," and I excused myself, went outside.

E2k1cal2                    Fishstein - direct

1    There were some agents outside.  It was very, very hot that day

2    and that hallway was very hot, so nobody really wanted to be in

3    there if they didn't have to be.

4    Q.  The other agents that you just mentioned, were they near

5    Mr. Calix?

6    A.  There were just the two of us that were kind of in close

7    proximity 'cause we were watching him, and I don't know who was

8    where when I walked out, but there was nobody congregating

9    around him, if that's the question.

10   Q.  You mentioned earlier a consent to search.  Were you

11   present for any consent to search -- when Mr. Calix signed any

12   consent to search?

13   A.  No, I was not.

14   Q.  You said that you had gone outside.  How long were you

15   outside of the apartment building for?

16   A.  15 or 20 minutes, perhaps.  I had phone calls to make to

17   three supervisors.

18   Q.  Did you reenter the building after that?

19   A.  Yes.

20   Q.  At that point in time what did you observe?

21   A.  Mr. Calix was still in the same place that I had left him,

22   in that corner.  There was a cup of water -- cup that must have

23   contained water, was empty, on the floor next to him.  I had --

24   I think he asked me to re -- if he could get some more water,

25   and I took the cup, I went inside the apartment, found the

1    kitchen and obtained some more water and brought it back to

2    him.

3    Q.  Did you say anything else to Mr. Calix while he was seated

4    in the lobby?

5    A.  No, not at that time, no.

6    Q.  Did you hear any other law enforcement officers say

7    anything to Mr. Calix while he was seated there in the lobby?

8    A.  No.

9    Q.  And did there come a time when Mr. Calix was moved from the

10   lobby of that building?

11   A.  Yes, when we transported him to 26 Federal Plaza.

12   Q.  Approximately what time was that?

13   A.  Approximately 8:30, 8:45.

14   Q.  Why did you --

15              MR. COOPER:  One moment, your Honor.

16              THE COURT:  Sure.

17   Q.  When Mr. Calix was initially encountered and arrested, what

18   was his demeanor?

19   A.  He was visibly upset, no more so than any other person that

20   I've ever, you know, seen arrested, woken up out of their sleep

21   to get arrested on a hot morning.

22              THE COURT:  Were you present when he was woken up?

23              THE WITNESS:  No, but I was right outside when they

24   walked him out 'cause it's -- couldn't have been more than 30

25   seconds afterwards.

E2k1cal2                    Fishstein - direct

1      THE COURT:  Okay.

2  Q.  Did there come a point in time when Mr. Calix calmed down?

3  A.  Yes.  I mean, eventually, you know, he just was, you know,

4  sitting there.  He was fine.

5  Q.  And did that happen before you left to go outside to make

6  your phone calls?

7  A.  Yeah, he seemed okay, normal, breathing normally when I

8  left.

9  Q.  You mentioned that Mr. Calix was transported from the

10  building.  Where was he taken to?

11  A.  To 26 Federal Plaza, the FBI office.

12  Q.  Why was he taken there and not to the courthouse?

13  A.  He was taken there as a matter of course to be processed.

14  His arrest had to be processed.  It's processed -- it's an FBI

15  arrest.  It has to be processed in an FBI facility.

16  Q.  Is it common for a defendant to be taken to FBI and not to

17  the court?

18  A.  That's procedure.

19  Q.  Who transported Mr. Calix?

20  A.  He -- Mr. Calix was transported in Agent Floyd's car.

21  Agent Floyd was the driver, Mr. Calix was seated in the right

22  rear seat behind the passenger seat, and I sat in the left rear

23  seat behind the driver.

24  Q.  During that car ride did you say anything to Mr. Calix?

25  A.  The only thing I recall is I turned to him and I said,

1    "Well, I'm glad we got you today because I was really getting

2    tired of looking for you in Mount Vernon."

3    Q.   What did you mean by that?

4    A.   Well, because we -- Mr. Calix is a Mount Vernon resident

5    and had a recent address in Mount Vernon and had family in

6    Mount Vernon.  We really had, you know, established that we

7    were looking for him in Mount Vernon, primarily.  We didn't

8    have any other place to look for him at that time.

9    Q.   Did you hear Agent Floyd say anything to Mr. Calix during

10   that car ride?

11   A.   Not that I recall, no.

12   Q.   Can you please describe Mr. Calix's demeanor during that

13   car ride.

14   A.   He was angry and quiet and kind of staring straight ahead.

15   Q.   Did he say anything to you or to Agent Floyd during the car

16   ride?

17   A.   Not that I recall.

18   Q.   When you arrived at the FBI offices, where did you go?

19   A.   We went up to a interview room and placed Mr. Calix inside.

20   Q.   Can you please describe that room.

21   A.   Sure.  Room -- it's a standard interview room, plain walls,

22   no adornments, painted a neutral color -- I think it was white

23   or off white -- desk, four chairs, two on each side, very

24   unassuming room.

25   Q.   Who was in the room?

1    A.   It was Mr. Calix on one side of the table, Detective --

2    myself and Agent Floyd on the other.

3    Q.   Was Mr. Calix handcuffed?

4    A.   At some point, yes, and then ultimately, once we began the

5    interview process, he was uncuffed.

6    Q.   Was he offered anything to eat or drink?

7    A.   Yes.

8    Q.   Was anything provided to him?

9    A.   I believe he asked for coffee and coffee was provided.

10   Q.   Did there come a time when Mr. Calix signed a *Miranda*

11   waiver form?

12   A.   Yes.

13   Q.   In that room prior to that point in time had you said

14   anything to Mr. Calix?

15   A.   Nothing more than just instruction as to where to sit and,

16   you know, question about whether, you know -- what, if

17   anything, he wanted to eat or drink.

18            MR. COOPER:  May I approach, your Honor?

19            THE COURT:  Yes.

20   Q.   I'm showing you what's in evidence as Government Exhibit 2.

21   Do you recognize this document?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is the advice of rights or *Miranda* form that Agent

25   Floyd read to Mr. Calix on the day of his arrest.

1    Q.  Did Mr. Calix sign this form?

2    A.  Yes.

3    Q.  Did you sign this form as a witness?

4    A.  I did.

5    Q.  What, if anything, did Mr. Calix say or do to manifest his

6    understanding of this form?

7    A.  Agent Floyd read it, word for word right off the page, and

8    then he verbally asked if he would, you know -- Agent Floyd

9    asked Mr. Calix if he would, you know, entertain answering our

10   questions, and he said that he would, and he signed it to

11   indicate that he would.

12   Q.  Where was the form positioned when Agent Floyd read it to

13   Mr. Calix?

14   A.  He was reading off of it so he had it in his hand in front

15   of him.

16   Q.  Did Mr. Calix ask any questions about the form?

17   A.  No.

18   Q.  Please describe what, if anything, you said to Mr. Calix

19   regarding this form.

20   A.  Just that prior to Agent Floyd starting, I said, "We're

21   going to read you your rights and then once you've heard them,

22   you can decide whether you'd like to talk about why you're here

23   today and answer any questions that we have."

24   Q.  What was Agent Floyd's tone of voice when he was talking to

25   Mr. Calix about this form?

E2k1cal2                    Fishstein - direct

1    A.  Read it in a neutral voice, speaking voice.

2    Q.  Was there any yelling?

3    A.  Absolutely not.

4    Q.  Please describe how Mr. Calix appeared to you while Agent

5    Floyd was reading this form, Government Exhibit 2.

6    A.  He was fine.  He just sat there and he was attentive and he

7    listened to every question and there was no -- no issue.

8    Q.  When you said those things that you described to Mr. Calix,

9    what was your tone of voice?

10   A.  Same speaking voice that I'm using right now.

11   Q.  Was Mr. Calix asked if he understood his rights?

12   A.  I believe that he was, yes.

13   Q.  At what point in time?

14   A.  Right at the end where it says it.

15   Q.  Are you referring to Government Exhibit 2?

16   A.  Yes.

17   Q.  Could you read the portion of Government Exhibit 2 that

18   you're referring to.

19   A.  Yes.  It says here on the last line, right above where the

20   signature is, "I have read this statement of my rights and I

21   understand what my rights are.  At this time I am willing to

22   answer questions without a lawyer present."  Below that is the

23   line that says Signed, and it's signed by Mr. Calix.

24   Q.  Were you there when Mr. Calix signed that?

25   A.  Yes.

E2k1cal2                    Fishstein - direct

1    Q.  Can you please briefly describe what Mr. Calix said after

2    he signed this form.

3    A.  Well, we went into talking about each one of these

4    individual bank robberies in which Mr. Calix admitted to

5    committing each and every one of them.

6              MR. COOPER:  One moment, please, your Honor.

7              MR. COOPER:  No further questions.

8              THE COURT:  All right.  Cross-examination.

9    CROSS-EXAMINATION

10   BY MS. BAUMGARTEL:

11   Q.  Good afternoon, Detective.

12   A.  Good afternoon.

13   Q.  So you identified Mr. Calix as the person named in your

14   arrest warrant, basically as soon as you saw him that day,

15   right?

16   A.  Yes.  When I saw him come out of the room, I recognized

17   him.

18   Q.  You were familiar with his appearance from the

19   investigation that you had completed, correct?

20   A.  Yes.

21   Q.  And so you immediately knew that he was Andre Calix, right?

22   A.  I did.

23   Q.  Now you don't specifically recall how you entered that

24   building on that morning, correct?

25   A.  I wasn't the first one in the door so I don't -- I couldn't

1   tell you if the door was unlocked or if someone opened it.

2   Q.  Who let you in?

3   A.  As I said, I followed.  I was one of the last people in, so

4   the doors were already open.

5   Q.  So you don't know how they came to be open, correct?

6   A.  No, I do not.

7   Q.  Now you also were not in the actual apartment when

8   Mr. Calix was arrested, right?

9   A.  No.

10  Q.  You had stepped out into the lobby, right?

11          THE COURT:  Let me ask a question about the doors.

12  Are you talking about the outside doors or the inside apartment

13  door?

14          THE WITNESS:  I believe that we're talking about the

15  doors from the street into the lobby.

16          MS. BAUMGARTEL:  Yes, your Honor, that was -- I was

17  referring to the doors that lead from outside the street into

18  the lobby.

19  Q.  Now speaking about inside the apartment, you were not

20  present inside the apartment when Mr. Calix was arrested,

21  right?

22  A.  No.

23  Q.  You had stepped out into the lobby of the building, right?

24  A.  Yes.

25  Q.  It was a small space in that apartment, right?

1   A.  That and we weren't wearing bulletproof vests at that time,

2   and because we knew that -- or we felt that Mr. Calix was

3   armed, we weren't going to be the first ones in.

4   Q.  So there were individuals who were wearing bulletproof

5   vests who were the first ones in, right?

6   A.  Yes.

7   Q.  And they went in with their guns drawn, right?

8   A.  I didn't see that but I would assume so.

9   Q.  And they knocked down the door, right?

10  A.  Knocked down the door?  No.

11  Q.  Kicked in the door?

12  A.  No.  Pushed it open or opened it.

13          THE COURT:  Were you able to see?

14          THE WITNESS:  I did not see it, no.

15          THE COURT:  So you don't know what they did yourself.

16          THE WITNESS:  Right.  But I can say that after the

17  fact the door was not laying on the floor.

18          THE COURT:  I see.

19  Q.  Did you hear any noise when they entered the apartment?

20  A.  No.  Other than voices, no.

21  Q.  And you heard elevated voices, right?

22  A.  Yes.

23  Q.  They screamed at Mr. Calix when they entered the apartment,

24  right?

25  A.  They identified themselves.

1    Q.  Did they identify themselves in a raised voice?

2    A.  In a loud clear voice so there was no mistaking who they

3    were.

4    Q.  Did they tell him to get down on the ground?

5    A.  Specifics of what they said, I couldn't tell you.  I don't

6    know.

7    Q.  So very shortly after you hear this, he's brought out into

8    the lobby, right?

9    A.  Yes.

10   Q.  And he's in handcuffs the whole time that he's in the

11   lobby, right?

12   A.  Yes.

13   Q.  And you're not present the whole time he's in the lobby,

14   correct?

15   A.  That is correct.

16   Q.  So there was a period of time, something like 15 to 20

17   minutes, when you were not by Mr. Calix in the lobby, right?

18   A.  That is correct.

19   Q.  And so you don't know what was said to him during that

20   period of time, right?

21   A.  I do not.

22   Q.  And you were not present when he signed a consent to

23   search, right?

24   A.  I was not, no.

25   Q.  So you didn't witness him sign a consent, right?

1    A.  I did not.

2    Q.  And you have no idea what may have been said to him prior

3    to him signing the consent by other officers, right?

4    A.  Correct, I do not.

5    Q.  Did you participate in the search of the apartment at all?

6    A.  Not -- yes and no.

7    Q.  Did you -- in what way did you participate?

8    A.  After the consent was obtained, I went into the apartment

9    briefly, just because I was very familiar with all the cases,

10   Agent Floyd had asked me to just look, see if there was any

11   obvious articles of clothing, 'cause it was a bedroom, there

12   was a closet there with clothing, there was clothing hanging on

13   the back of a door.  I just did a quick look around.  I saw a

14   few things -- a shirt, a hat -- that I thought might have been

15   articles of clothing that Mr. Calix had worn in some of the

16   bank robberies, and I just verbally pointed that out.

17   Q.  When you were in the apartment doing that search, you

18   didn't see a firearm, right?

19   A.  I did not.

20   Q.  Did you see marked money?

21   A.  I did not.

22   Q.  And are you familiar with the -- did you discuss the search

23   with other agents after they completed it?

24   A.  I did.

25   Q.  And so you're aware that there was a gun found in the

1    apartment, right?

2    A.  Yes.

3    Q.  And you're aware that that gun was found concealed in the

4    mattress, right?

5    A.  I was aware that it was found hidden.  Specifically where,

6    I didn't -- I don't know.

7    Q.  Who took pictures to document the search?

8    A.  I don't know.

9    Q.  Do you know if any agent did?

10   A.  I do not.  I was not present for that.

11   Q.  Is it your standard practice or the practice of the robbery

12   squad to take pictures to document searches?

13   A.  I would take photos of a search if I did it as per NYPD

14   procedure, but this was an FBI investigation.  I can't comment

15   on what they did.

16   Q.  So you don't know if any photographs were taken.

17   A.  I do not.

18   Q.  So let's talk a little bit about the car ride that you took

19   with Mr. Calix.  I think you said that you transported him

20   down, or you were among the officers to transport him at 8:45,

21   is that right?

22   A.  Approximately.

23   Q.  And it doesn't take two hours to drive from 151st down to

24   26 Federal Plaza, right?

25   A.  No, I wouldn't think so, although it was rush hour.

1   Q.  The best you can recall, it didn't take two hours, right?

2   A.  I wouldn't think it took a full two hours, no.

3   Q.  But during the time that you were in the car you were

4   seated next to Mr. Calix, right?

5   A.  Yes.

6   Q.  And you were speaking to him during the ride, right?

7   A.  I said one thing to him.

8   Q.  You only said one thing to him.

9   A.  Yes, that I was so relieved that I didn't have to go to

10  Mount Vernon anymore.

11  Q.  Did you say to Mr. Calix that it would be in his interests

12  to cooperate with you?

13  A.  I don't recall saying that, no.

14  Q.  So you didn't say that.

15  A.  No.

16  Q.  Did you say to Mr. Calix that it would be to his benefit to

17  cooperate in the investigation?

18  A.  No.

19  Q.  Did anyone in the car say that to him?

20  A.  Not that I recall.

21  Q.  Did you ever say that to him before he signed the *Miranda*

22  waiver?

23  A.  No.

24  Q.  Isn't it true that in the car ride down you had a full

25  conversation with Mr. Calix?

1    A.  Not that I recall.

2    Q.  And isn't it true that you asked him questions about his

3    family?

4    A.  Not that I recall.

5    Q.  Didn't you ask him where his grandmother was from?

6    A.  No.

7    Q.  Didn't you ask him details about all of the bank robberies?

8    A.  I did not.

9    Q.  Didn't you ask him when he used a gun and if there were

10   some robberies where he did and some robberies where he didn't?

11   A.  I did not.

12   Q.  And didn't you tell him that you were doing research for

13   other cases because you wanted to know how bank robbers

14   operated?

15   A.  Absolutely not.

16   Q.  You never said any of these things to him.

17   A.  No.

18   Q.  Did there come any point during the time that you were with

19   Mr. Calix where you spoke to him about the benefits of

20   cooperating?

21   A.  No.

22   Q.  You never said that Mr. Calix should cooperate with you.

23            THE COURT:  During the car ride or --

24            MS. BAUMGARTEL:  No.

25   Q.  During the course of your entire interaction with Mr. Calix

1    that day.

2    A.  Could we just go back.  Are we talking about the car ride

3    now or are we talking about --

4    Q.  The whole time that you were talking to Mr. Calix, either

5    the car ride or any time later, did you ever speak to him about

6    the benefits of cooperating?

7    A.  After the *Miranda* warnings, after the *Miranda* was read and

8    the -- and questioning began, we talked.  I may have said that

9    it could be beneficial, you know, to be truthful, but not

10   during the car ride.  So I was -- I'm confused.  Are we talking

11   about the car ride or are we talking about --

12   Q.  Why don't you tell us when -- if you told Mr. Calix at any

13   point that it would be beneficial to cooperate and when you

14   told him that.

15   A.  After this was signed, when we were in 26 Federal Plaza, as

16   we started to talk about bank robberies, that's when I said

17   something to that effect.  Never in the car.  Not before

18   *Miranda*.

19   Q.  And what did you say?

20   A.  I'm sorry?

21   Q.  What did you say?

22   A.  When we were talking about bank robberies, I said, it

23   couldn't hurt to cooperate and, you know, be honest about what

24   happened.  We had already been talking about bank robberies.

25   He had already started to admit to them and we were two or

1    three in.

2    Q.  So it's your testimony that he started to admit to bank

3    robberies and it was only after that that you told him it would

4    be beneficial to cooperate?

5    A.  I said it couldn't hurt.

6    Q.  So at no point before he admitted to participating in bank

7    robberies did you encourage him to cooperate.

8    A.  No.

9    Q.  Now you're a New York police detective, right?

10   A.  Yes, I am.

11   Q.  Your primary employment is with the New York Police

12   Department?

13   A.  Yes.

14   Q.  You're not a federal agent.

15   A.  I am not.

16   Q.  You're familiar with New York laws, right?

17   A.  I am.

18   Q.  Aren't you required to have someone have a lawyer during

19   questioning if they're arrested pursuant to an arrest warrant?

20   A.  In New York State Court, yes.

21   Q.  But you thought you could get around that because this was

22   federal court.

23             MR. COOPER:  Objection.

24             THE COURT:  I'll allow that question.  I'll allow it.

25   Q.  You thought you could avoid that requirement because this

1   is federal court.

2   A.   This is -- this was an FBI arrest, not an NYPD arrest.  I

3   was not the arresting officer.

4   Q.   Who was the arresting officer?

5   A.   Special Agent Floyd.

6   Q.   Now when Mr. Calix was first arrested, I think you

7   testified on direct his demeanor was akin to anybody else who

8   had been arrested, is that correct?

9   A.   Yes.

10  Q.   Isn't it true that Mr. Calix started hyperventilating?

11  A.   I don't recall hyperventilating, no.

12  Q.   Isn't it true that he was offered medical attention?

13  A.   I do not recall that at all.

14  Q.   So your recollection is that he was not hyperventilating

15  and was not offered medical attention.

16  A.   I do not recall anybody offering him medical attention.

17  Maybe it was done when I was not present.

18  Q.   But it's your testimony that he was breathing normally?

19  A.   At first he was breathing heavy because of what happened,

20  getting woke up, being dragged out of the room and placed in

21  custody.  After that he calmed down.  It was like any other

22  arrest.

23          MS. BAUMGARTEL:  I'm sorry, your Honor.  Just one

24  moment, please.

25  Q.   Now let me ask you some questions now just to focus on when

1  you're in the interview room with Mr. Calix.

2           Prior to him signing the *Miranda* waiver did you ask

3  him any questions?

4  A.  No.

5  Q.  And did you tell him at all about the evidence you had

6  against him?

7  A.  Not prior to signing this document, no.

8  Q.  So it's your testimony that every statement you made to

9  Mr. Calix other than the single one that you highlighted in the

10  car ride down was after he signed the *Miranda* waiver?

11  A.  Yes.

12  Q.  And after he signed the *Miranda* waiver, you then spoke with

13  him about the evidence you had against him, right?

14  A.  Yes.

15  Q.  Because initially he denied being involved in bank

16  robberies, right?

17  A.  I don't recall him denying being involved.  No, I don't

18  recall that.

19  Q.  You showed him pictures from particular bank robberies,

20  right?

21  A.  Yes, as the interview progressed.

22  Q.  And you told him that he could clearly be identified in the

23  pictures, right?

24  A.  They were very clear pictures.

25  Q.  And he denied that it was him in the pictures, right?

1    A.  No, he admitted that it was him in the pictures.

2    Q.  Now this interview was conducted by both you and Officer

3    Floyd, correct?

4    A.  Agent Floyd, yes.

5    Q.  Agent Floyd.  I'm sorry.

6    A.  That's all right.

7    Q.  And Agent Floyd was responsible for writing up the notes of

8    the interview, right?

9    A.  I may -- yes, yes, he was the one that wrote them.

10   Q.  Did you take any notes from the interview?

11   A.  No, I did not.

12   Q.  Did you take any handwritten notes of any kind during the

13   interview?

14   A.  Absolutely not.

15   Q.  So at any point did you tell Mr. Calix that he should speak

16   to you because it would help him with the prosecutor?

17   A.  No.

18   Q.  At any point did you tell Mr. Calix that he should speak to

19   you because you'd already found the gun in his apartment?

20   A.  I don't recall saying that, no.

21   Q.  Did Agent Floyd say that?

22   A.  He may have, but I don't recall.

23   Q.  Were you and Agent Floyd together conducting this

24   interrogation for the entire time?

25   A.  Yes.

e2k1cal2                    Fishstein - cross

1    Q.  So you would have been present for anything he said, right?

2    A.  I would have, yes.

3    Q.  And so it's your testimony that you don't recall him saying

4    anything about discovering a gun in the apartment?

5    A.  It's quite possible that he did.  I just don't have an

6    independent recollection of it.  I'm not going to say that I do

7    if I don't.

8    Q.  I'm going to show you something to see if it refreshes your

9    recollection.  I'm going to -- it's Government 3502-H.

10             MS. BAUMGARTEL:  Your Honor, may I approach?

11             THE COURT:  Yes, yes.

12   Q.  I apologize.  I just have the one copy with me, but --

13   A.  Sure, that's fine.

14   Q.  -- but if you read from the bottom to the top, from the

15   bottom of page 1 of 3502-H --

16   A.  From where?  Just point to it.

17   Q.  Right here (indicating).

18   A.  Where it says Detective, my name.

19   Q.  Yes, and through the rest of it.

20   A.  (Witness complies.)

21        Okay.

22   Q.  Does that refresh your recollection that either you or

23   perhaps Agent Floyd told Mr. Calix about the gun that was

24   discovered?

25   A.  Well, it seems to say that Agent Floyd did.

e2k1cal2                    Fishstein - cross

1   Q.  Okay.  So does that refresh your recollection that Agent

2   Floyd told Mr. Calix about the gun that was discovered?

3   A.  Yes.

4   Q.  And that was one of the things you said to encourage him to

5   continue answering your questions, right?

6   A.  Well, I didn't say it.

7   Q.  I'm sorry.  That was something that Agent Floyd said to

8   encourage Mr. Calix to continue answering your questions.

9   A.  It was just a statement of fact.

10  Q.  So in your opinion there was no basis, reason for Agent

11  Floyd to say it?

12          MR. COOPER:  Objection.

13  A.  I'm sorry.  I'm confused.

14          THE COURT:  I don't think this witness can testify as

15  to what was in Agent Floyd's mind.

16  Q.  Sir, you're a very experienced interrogator, right?

17  A.  Yes, I believe so.

18  Q.  And you have different techniques that you use to encourage

19  individuals to answer your questions, right?

20  A.  Yes.

21  Q.  And one thing that you do in your practice is to share with

22  them the incriminating evidence that you have, right?

23  A.  Yes.

24  Q.  And that's a technique you know is often successful at

25  convincing them to answer questions, right?

1   A.  Yes.

2   Q.  And that's certainly part of what was being done in this

3   interview, right?

4   A.  Yes.

5   Q.  You were showing -- you or Agent Floyd were showing

6   Mr. Calix photographs, right?

7   A.  Yes.

8   Q.  And you were telling him about the strength of the evidence

9   that you had against him, right?

10  A.  Yes.

11  Q.  And as part of that, you or Agent Floyd mentioned to him

12  that you had found a gun and red dye packs in his apartment,

13  right?

14  A.  Apparently Agent Floyd told him, yes.

15  Q.  Now during the course of this interview you and Agent Floyd

16  also presented this as Mr. Calix's opportunity to speak to the

17  judge, right?

18  A.  I don't understand what the question is.

19  Q.  Either you or Agent Floyd told him that you could pass

20  along the things he said to the judge, right?

21  A.  I don't recall saying that, no.

22  Q.  Well, either you or Agent Floyd asked him if there was

23  anything else he wanted the judge or the prosecutor in his case

24  to know about, right?

25  A.  Possibly, but I don't recall saying it.

1   Q.  I'm going to show you this again to see if it refreshes

2   your recollection.

3   A.  Yes, please.

4           MS. BAUMGARTEL:  Your Honor, I'm referring again to

5   3502-H, and this is what's labeled page 5 out of 6 at the

6   bottom.

7   A.  This paragraph here, the one you have marked off?  Okay.

8   Q.  Yes.

9   A.  (Witness reviews exhibit.)

10          Do you want me to continue or -- onto this page?

11  Q.  No.  Does that refresh your recollection?

12  A.  Yes, apparently it was said.

13          THE COURT:  What was said?  Apparently what was said?

14          THE WITNESS:  Something to the effect of -- that if he

15  wanted to make some type of a statement regarding his reasoning

16  for why he did these -- why he committed these crimes, he could

17  do so.

18  Q.  And that it would be shared with the prosecutor or the

19  judge, right?

20  A.  Yes.

21  Q.  Detective, is it fair to say that you don't have a great

22  memory of your interrogation of Mr. Calix?

23  A.  No.

24  Q.  There are certainly details about it that you don't

25  remember, correct?

1    A.  There are certainly some details, yes.

2    Q.  Did you speak with Mr. Calix about the sentence that he

3    might be facing in this matter?

4    A.  No.

5    Q.  You didn't say anything to him about his possible

6    punishment.

7    A.  I don't think so, because I am not experienced with federal

8    Sentencing Guidelines and I couldn't comment on that.

9    Q.  You're familiar with the penalties for bank robbery

10   generally, right?

11   A.  In the state, yes.

12   Q.  You're familiar that people who get convicted of bank

13   robbery tend to get long prison sentences, right?

14   A.  Yes, absolutely.

15   Q.  Did you speak with Mr. Calix at all about the possible

16   prison time he might be facing?

17   A.  Not in specific years, because again, I'm not familiar with

18   those Sentencing Guidelines.

19   Q.  Well, what did you say?

20   A.  I'm sure that I said something to the effect of that bank

21   robbery carries a heavy penalty, a prison sentence.

22   Q.  And did you suggest that speaking to you might be a way to

23   mitigate that sentence?

24   A.  No.  I suggested that speaking -- no, I don't recall that

25   at all, no.

e2k1cal2                    Fishstein - cross

1    Q.  So what would be the purpose of telling someone about the

2    punishment that they're facing?

3            MR. COOPER:  Objection.

4            MR. COOPER:  Your Honor, there's been no testimony --

5            THE COURT:  What was his purpose?

6            MS. BAUMGARTEL:  Yes.

7            MR. COOPER:  Your Honor --

8            THE COURT:  I'll allow that question.

9    A.  Could you repeat it, please.

10   Q.  So what is your purpose in telling someone the punishment

11   they're facing?

12   A.  Is to make them aware of exactly what's going on.

13   Q.  How is that something that you want to do as an

14   investigator?

15   A.  It's just something that, you know, I think you should do

16   as a person, to let them know, "Listen, this is part of the

17   statement, this is something that could, you know, impact your

18   life.  You should know that you're facing a long prison

19   sentence here."

20   Q.  And so -- withdrawn.

21           When you're speaking to someone who's a suspect or

22   who's arrested, the purpose of your conversation with them is

23   to elicit a confession, right?

24   A.  Correct.

25   Q.  Your job is not to inform them of their, you know, their

1   possible sentence, right?

2   A.  Just comes up.

3   Q.  Your job is to persuade them to answer your questions,

4   right?

5   A.  Yes.

6   Q.  So that you can get the information you need in order to

7   complete your case against them, right?

8   A.  Correct.

9   Q.  And so things that you say in the course of an

10  interrogation are oriented towards getting the person to answer

11  your questions, right?

12  A.  Correct.

13          MS. BAUMGARTEL:  Your Honor, just one moment, please.

14          (Pause)

15          MS. BAUMGARTEL:  I have nothing further.  Thank you.

16          THE COURT:  Thank you very much.

17          Any redirect?

18          MR. COOPER:  Briefly, your Honor.

19  REDIRECT EXAMINATION

20  BY MR. COOPER:

21  Q.  Detective Fishstein, do you recall being asked questions on

22  cross-examination about your initial entry into the apartment

23  building where Mr. Calix was arrested?

24  A.  Yes.

25  Q.  And you testified it was somewhere around 7:30 or 8 a.m.?

1   A.   Approximately, that we arrived, yes.

2   Q.   Were people, nonlaw enforcement people coming and going

3   from the building at that point in time?

4   A.   Yes.

5   Q.   Now you also were asked questions on cross-examination

6   about assisting in -- providing some assistance with the search

7   of Mr. Calix's bedroom.  Do you recall that?

8   A.   Yes.

9   Q.   What assistance did you provide?

10  A.   As I said before, I was asked to walk through just to see

11  if there were any articles of clothing that I recognized from

12  previous bank robberies, because I was more familiar with the

13  surveillance footage.

14  Q.   Can you please describe what you're referring to when you

15  say surveillance footage.

16  A.   Sure.  Each bank has a series of surveillance cameras,

17  surveillance system installed within each bank.  As a matter of

18  course, during the investigation, we obtained that surveillance

19  footage from the robbery and obtained photos of the suspect and

20  the crime in, you know -- being committed.

21  Q.   Had you identified any particular articles of clothing that

22  the suspect was wearing in the surveillance photos?

23  A.   Yeah.  Yes, I did.  There was a plaid shirt I recall and

24  there was a hat that I think I pointed out to one of the agents

25  as well.

1  Q.  Did you see those items of clothing in Mr. Calix's bedroom?

2  A.  Oh, yes.

3  Q.  Do you recall where they were located?

4  A.  I believe the shirt was maybe hanging on a -- on a hanger

5  in the closet, or on the back of a door, and the hat I think

6  was on the dresser.

7  Q.  Do you recall being asked on cross-examination about

8  whether you asked Mr. Calix questions about bank robberies he

9  had committed?

10  A.  I'm sorry.  Could you repeat it one more time?

11  Q.  Do you recall being asked questions on cross-examination

12  about whether you questioned Mr. Calix about bank robberies

13  that Mr. Calix had committed?

14  A.  Yes.

15  Q.  Had you asked those questions prior to Mr. Calix signing

16  the *Miranda* waiver form?

17  A.  No.

18  Q.  Do you also recall being asked questions about Agent --

19  whether Agent Floyd made any statements to the defendant

20  regarding a gun being found in the defendant's bedroom?

21  A.  Yes.

22  Q.  Were those statements by Agent Floyd made before the

23  defendant signed the *Miranda* waiver form or after?

24  A.  After.

25          MR. COOPER:  One moment, please, your Honor.

1     (Pause)

2   Q.  With respect to the shirt and the hat from the surveillance

3   photos that you described seeing in Mr. Calix's bedroom, were

4   those in plain view from where you were standing?

5   A.  Once I entered the room, yes, plain view.

6          MR. COOPER:  Thank you.  No further questions.

7          MS. BAUMGARTEL:  Your Honor, may I have a brief

8   recross-examination?

9          THE COURT:  Yes.

10         MS. BAUMGARTEL:  Thank you.

11         Do you have the government exhibit -- I think --

12   Government Exhibit 3 and Government Exhibit 5.

13         Your Honor, may I approach the witness?

14         THE COURT:  Yes, you may.

15  RECROSS EXAMINATION

16  BY MS. BAUMGARTEL:

17  Q.  I'm just going to refer to what has been previously entered

18  as government exhibits, Exhibits 3 and 5.  Can you show us in

19  those photographs where in plain sight the articles of clothing

20  you just described are.

21  A.  They are not shown in this photo or this one.

22  Q.  And I think you testified that one was located in a closet?

23  A.  Right.  There was like a -- like a little closet behind the

24  door, but I don't think these photos cover that area.  I don't

25  see it here.

1    Q.  So they're not in there.

2    A.  No.

3    Q.  Okay.

4    A.  No.

5    Q.  Thank you.

6    A.  You're welcome.  Do you want this one too?

7    Q.  Thank you.

8           And just -- you were asked on redirect about your

9    conversation with Mr. Calix at the FBI headquarters.  I believe

10   you testified on direct, when you showed the form to Mr. Calix,

11   you said that this was so he would entertain answering your

12   questions, is that right?

13          MR. COOPER:  Objection, your Honor.  This is outside

14   the scope of the redirect examination.

15          MS. BAUMGARTEL:  Your Honor, if it would be helpful, I

16   can explain briefly.

17          THE COURT:  I don't remember anything --

18   Q.  On redirect you were asked whether everything you said to

19   Mr. Calix was before or after he signed the *Miranda* waiver,

20   right?

21          MR. COOPER:  I object to that, your Honor.  I believe

22   that misstates the testimony on redirect examination.

23          MS. BAUMGARTEL:  Okay.  Maybe we could have a readback

24   of what the question was.  I think it's -- roughly, it was --

25   Q.  You had questions on redirect about whether what you said

e2k1cal2                    Fishstein - recross

1    to Mr. Calix was before or after he signed the *Miranda*, right?

2         THE COURT:  Yes, I guess he did.

3         MS. BAUMGARTEL:  Okay.  So I'd like to talk about that

4    for a moment.

5         THE COURT:  All right.

6    Q.  So after someone signs a Miranda waiver, that doesn't mean

7    they have to answer your questions, right?

8    A.  Correct.

9    Q.  They could at any point choose not to answer your

10   questions, right?

11   A.  Absolutely.

12   Q.  And they could at any point withdraw their consent to speak

13   to you, right?

14   A.  That is correct.

15        MS. BAUMGARTEL:  Okay.  I have nothing further.  Thank

16   you.

17        THE COURT:  All right.  I'd like to ask one question.

18        THE WITNESS:  Yes, sir.

19        THE COURT:  That goes to the apartment, and when you

20   were outside the apartment when it was entered by other agents,

21   where were you?

22        THE WITNESS:  In the lobby.

23        THE COURT:  In the lobby.  And how long was it before

24   you came into the hallway where the entrance to the apartment

25   was?

1    THE WITNESS:  It's a very small space that we're

2  talking about.  Hard to describe, but --

3    THE COURT:  You may have delayed a few minutes.

4  That's why I'm asking the question.

5    Did you go directly in as soon as you heard it or did

6  you wait?

7    THE WITNESS:  I'm just trying to -- I'm trying to -- I

8  want to answer it accurately.  If we -- when we walked into the

9  lobby, after the knock was made, the lady was spoken with, and

10  then the door was indicated -- that door is very close.  It's

11  right there.  The agents made the primary.  We stood back in

12  the lobby area.  Maybe -- it's not a huge distance, but then I

13  never went -- I did not proceed in there until much later after

14  the consent to search was signed.

15    THE COURT:  So where did you stay in that period of

16  time after the agents made the entry --

17    THE WITNESS:  And Mr. Calix was apprehended?

18    THE COURT:  -- and when Mr. Calix was apprehended?

19    THE WITNESS:  Other than the lobby area, at some point

20  I went outside to make some phone calls and --

21    THE COURT:  But at some point Mr. Calix came out with

22  the arresting officers.

23    THE WITNESS:  Yes.  That was -- this all happened very

24  quickly in the beginning.

25    THE COURT:  And you saw that.

e2k1cal2          Fishstein

1          THE WITNESS:  I saw them bringing him out.  Yes, sir,

2     yes, sir.

3          THE COURT:  And then was he placed near the door for a

4     while or was he placed some other place in the hallway?

5          THE WITNESS:  He was placed in one spot and wasn't

6     moved around at all until we trans -- until it was time to

7     leave, and that was in this corner of where the front of the

8     building makes the right angle with the wall that forms the

9     outer wall, I guess, of the apartment.

10          THE COURT:  Did you see him any other place than that?

11          THE WITNESS:  No, sir.

12          THE COURT:  Okay.

13          MR. COOPER:  Just a few questions, your Honor.

14          THE COURT:  All right.  I opened some areas.  All

15     right.  That's all right.

16     REDIRECT EXAMINATION

17     BY MR. COOPER:

18     Q.  Detective Fishstein, when -- prior to the door to

19     Mr. Calix's bedroom being opened, immediately prior, how far

20     from that door were you standing in terms of feet?

21     A.  Approximately, 20 feet, 25 feet.

22     Q.  And you were asked by Ms. Baumgartel about the interview of

23     Mr. Calix after he signed the *Miranda* form.  Did he ever

24     withdraw his consent at any point after he signed the *Miranda*

25     form?

e2k1cal2

1    A.  No.

2            MR. COOPER:  Thank you.  No further questions.

3            THE COURT:  Anything else?

4            MS. BAUMGARTEL:  No.  Thank you, your Honor.

5            THE COURT:  You're done.

6            THE WITNESS:  Thank you, your Honor.

7            THE COURT:  Thank you very much.

8            (Witness excused)

9            THE COURT:  Well, how long do you want to send in

10   briefs, joint briefs?

11           MS. BAUMGARTEL:  Your Honor, may I confer briefly with

12   the government about an issue?

13           THE COURT:  Sure.

14           MS. BAUMGARTEL:  Thank you.

15           (Counsel conferring)

16           MS. BAUMGARTEL:  Your Honor --

17           THE COURT:  Yes?

18           MS. BAUMGARTEL:  Your Honor, I apologize.  I have

19   asked the government if they would be willing to stipulate to

20   certain pieces of evidence and they have declined, and so I'm

21   going to need to ask for a continuation of the evidentiary

22   hearing.  There are several photographs that were provided in

23   discovery as well as my client's statement, which the

24   government has declined to stipulate to the admission to, and

25   so we're going to need to call the agent who took the

e2k1cal2

1  photographs who hasn't yet been identified by the government to

2  show where certain evidence was located, as well as re-calling

3  Agent Floyd; again, because it's impeachment of the individual

4  who just testified.

5          THE COURT:  Impeachment of this man?

6          MS. BAUMGARTEL:  Yes.

7          MR. COOPER:  Your Honor, with respect to the second

8  piece, re-calling Agent Floyd, it's the government's position

9  that that issue, it's not an issue in this proceeding.  The

10 defense's challenge to the defendant's statement, to the

11 admission of the defendant's statement is that it was part of a

12 two-step process where the defendant was first questioned prior

13 to *Miranda* and then after -- about the same issues after he was

14 given *Miranda*.  The contents of his post*Miranda* statements are

15 irrelevant, and particularly to re-call a witness for that fact

16 when the -- when the witness who just testified stated a number

17 of times that he didn't recall what was said.  Seems to us to

18 be beside the point and not a productive use of time.

19         MS. BAUMGARTEL:  Your Honor, may I please first ask

20 the fact witness to step out of the courtroom for this

21 argument.  The detective who just testified is still here.

22         THE COURT:  I didn't even know whether he was here

23 yet.  Oh, I see.

24         MS. BAUMGARTEL:  I'd ask him to step out.

25         And then, your Honor, I'd like to say a few things.

e2k1cal2

1    As to the second piece, the testimony of Agent Floyd was that

2    that witness had a conversation with Mr. Calix during the ride

3    down to -- first off, that they had a conversation during the

4    ride down to the 26 Federal Plaza but then in addition, Agent

5    Floyd participated in the interrogation and had extensive notes

6    of the interrogation that are not consistent with the testimony

7    that this officer just gave, so if the government would simply

8    stipulate to putting the notes in, which are also the notes of

9    my client's statements, that would be fine for the purposes of

10   this hearing, but if not, then he needs to be re-called so that

11   he can attest to the accuracy of his notes.

12       MR. COOPER:  Your Honor, defense counsel questioned on

13   cross-examination Special Agent Floyd extensively, both about

14   that car ride down to FBI headquarters and about the content of

15   the defendant's postarrest statements, and defense counsel had

16   the 302 at that point.

17       THE COURT:  I can't remember back of my own

18   recollection as to what went on two weeks ago.  It's been put

19   off a while.  I don't know quite what you're getting at.  I

20   presume what you're getting at is, one, that Ms. Baumgartel

21   wants to have people questioned about the photographs because

22   she's questioning the location of the hat and the shirt.  Is

23   that right?

24       MS. BAUMGARTEL:  Your Honor, I just want the court to

25   have the government's own photographs as to where the gun was

e2k1cal2

1  located.

2      THE COURT:  Oh, where the gun was located.

3      MS. BAUMGARTEL:  Yes, that was discovered in the

4  search.  Each witness basically testified that they didn't

5  know, and we have pictures that were provided by the government

6  in discovery, so if we could put them in by stipulation, that

7  would be fine, but if not, then the government needs to

8  disclose what witness took them and we can give them to the

9  court.

10      MR. COOPER:  Your Honor, those three photographs are

11  fine with the government.  We have no objection to them coming

12  in.

13      THE COURT:  Photographs?  If the gun was hidden, the

14  photographs won't show it.

15      MS. BAUMGARTEL:  Your Honor --

16      THE COURT:  If the gun -- if there's a picture of the

17  gun that had been, removed because as I understand the

18  testimony, the gun was hidden and so they had to remove it to

19  take its picture.

20      Am I too far back?  I probably am.

21      MS. BAUMGARTEL:  Yes, your Honor, but one of the

22  arguments the government made in its pretrial briefing, or

23  prehearing briefing -- and I don't know if they're pressing

24  this -- is that the evidence that was discovered was

25  essentially in Mr. Calix's grab area and therefore was somehow

e2k1cal2

1    discovered pursuant to that, either some sort of grab area

2    exception or search incident to arrest exception, and I think

3    that if the court can see the actual location of the gun, it's

4    very clear that that does not apply, and so perhaps the

5    government has abandoned that argument, but I think it's still

6    useful to the court to know where in this search the gun was

7    discovered.

8        MR. COOPER:  Your Honor, if I may briefly respond on

9    that.

10       We don't object to the pictures coming in.  We think

11   they're not all that helpful without the context of where the

12   item was located and where the pictures were taken, either

13   prior to this search or after the search.

14       And secondly, the government did argue in the

15   prehearing briefing that in addition to consent, the search was

16   lawful and also search incident to arrest and a protective

17   sweep.  Frankly, where the gun was ultimately recovered from is

18   not all that relevant to whether the agents had a basis to do

19   that.

20       But with that said, we don't object to the pictures

21   coming in.

22       THE COURT:  Which pictures are you talking about?

23       MR. COOPER:  It's three pictures, your Honor, as I

24   understand it.  One of the gun after it was recovered in the

25   search displayed outside of a bag in which it was contained,

e2k1cal2

1  and two other pictures that appear to show the bed that was in

2  Mr. Calix's bedroom.

3          MS. BAUMGARTEL:  It's actually four pictures, your

4  Honor.  If I can put those into evidence, I will do that at

5  this time.

6          THE COURT:  Is there a contest about the gun being

7  improperly seized?

8          MS. BAUMGARTEL:  Yes.

9          THE COURT:  On the theory that it was not within the

10 grab area?

11         MS. BAUMGARTEL:  Yes, your Honor.  So in addition --

12 so our arguments are, we're arguing that there was no valid

13 consent to search, but then the government has alternatively

14 argued that even if there wasn't a consent to search the entire

15 apartment, evidence could have been discovered pursuant to

16 these other exceptions, including perhaps a grab area search or

17 a search incident to arrest and --

18         THE COURT:  I thought this man just slept in that one

19 bedroom that wasn't in an apartment really, it didn't have a

20 separate bathroom, it was a single bedroom, and that's where he

21 was arrested.

22         MS. BAUMGARTEL:  Well, he was actually arrested half

23 in and half out of that, but yes.

24         THE COURT:  Well, he was in the doorway, but he was

25 seen in the bedroom and the -- when they tackled him, he fell

e2k1cal2

1   between the doors is my recollection.

2            MS. BAUMGARTEL:  I think that's right, your Honor.

3   But the good news is the government has stipulated --

4            THE COURT:  That's not a very big bedroom.

5            MS. BAUMGARTEL:  Even so.  Your Honor, since the

6   government --

7            THE COURT:  I'm not sure if everything isn't within

8   the grab area in that bedroom, but I won't get into that.

9            But what about a search incident to arrest?

10           MS. BAUMGARTEL:  Well, you can't search a person's

11  property incident to arrest, so just because a person is

12  arrested --

13           THE COURT:  You can search --

14           MS. BAUMGARTEL:  Him, but this gun was not discovered

15  on him.

16           THE COURT:  We also have the theory -- may not be

17  relevant here -- that they are entitled to do an immediate

18  search of the area if there's a possibility of a gun being

19  there.  I've had that in other cases.

20           MS. BAUMGARTEL:  Your Honor, the government hasn't

21  argued exigent circumstances, and I think that that argument

22  would fail because in this case you had something like eight

23  law enforcement officers who certainly had time to secure, had

24  essentially already secured the premises, and there was no

25  impediment or reason that they could not have sought to obtain

e2k1cal2

1    a warrant, so I don't think -- the government hasn't argued it

2    and I don't think that they would be able to argue exigent

3    circumstances.

4              THE COURT:  I wasn't talking about exigent

5    circumstances.

6              MR. COOPER:  Your Honor, again, the government has no

7    objection to those four pictures coming into evidence.  We do,

8    however, have an objection to re-calling Agent Floyd, given the

9    defense's lengthy opportunity to cross-examine Agent Floyd with

10   his 302.

11             THE COURT:  What is the area that you want to examine

12   Agent Floyd on?

13             MS. BAUMGARTEL:  Your Honor, I just want to verify the

14   accuracy of his 302, which contradicts many of the things that

15   Detective Fishstein just testified to.  And so it's not so much

16   that I need to ask him specific additional questions other than

17   he was the person who actually completed this report of the

18   interview, and so I need him to verify its accuracy and

19   authenticity if the government will not stipulate to it.

20             MR. COOPER:  Your Honor, by that report coming in,

21   it's essentially a way to get the defendant's statements into

22   evidence without calling the defendant or otherwise getting

23   around the hearsay rule.

24             MS. BAUMGARTEL:  Well, there are no hearsay rules in a

25   suppression hearing, but if your Honor wanted, you could black

1   out and disregard my client's statements in this because

2   frankly, my client's statements -- this is his confession.

3   Those are not the statements that are helpful to us.  What this

4   documents are the things that were said to my client to induce

5   him to talk to the police, which the detective just denied.

6           MR. COOPER:  Your Honor, fundamentally all the issues

7   and all the statements in the 302 relate to what happened after

8   the defendant signed the *Miranda* waiver, which is not an issue

9   that the defense raised in the prehearing briefing and is

10  not -- I don't understand them to be pressing any arguments

11  about what the defendant did or did not do or what was said to

12  him after he signed the *Miranda* waiver.  The issue is whether

13  the waiver was entered into knowingly and voluntarily.  What

14  was said or done after the waiver really is irrelevant.

15          MS. BAUMGARTEL:  Your Honor -- I mean, that's not true

16  on several levels, your Honor.  First, the credibility of this

17  witness who just testified is very important, and to the extent

18  that there is a report by a fellow officer that contradicts

19  things that he said, that's important to his credibility

20  generally.

21          Second -- and this was the purpose of my last question

22  in the redirect and recross is, just that the government's

23  theory seems to be that after a *Miranda* waiver is signed, it

24  doesn't matter what happens after that, but that's not true.

25  Because a person can sign a *Miranda* waiver and still decide not

e2k1cal2

1  to answer questions, which is actually what Mr. Calix initially

2  did, and so if the government continues to make coercive

3  statements or statements that would coerce consent after a

4  *Miranda* waiver is signed, that's still relevant.

5          THE COURT:  Do we have the 302?  I guess I have these

6  documents in front of me.

7          MS. BAUMGARTEL:  Your Honor, that's the other issue

8  is, of course you have them.

9          MR. O'DONNELL:  It's 3205-H, your Honor.

10         (Pause)

11         (Continued on next page)

E2KKCAL3

1          THE COURT:  Where is the portion in which you say --

2     I'm looking at what you referred to as the 302 statement.

3     Where is the portion where there's some indication Mr. Calix

4     didn't want to answer any further questions or stopped

5     voluntarily answering questions?  I've read this as quickly as

6     I could.

7          MS. BAUMGARTEL:  Oh, your Honor, the beginning is

8     where Calix initially said it was not him.  He asked what was

9     in it for him if he answered questions.  That's pages 1 and 2.

10    And, in fact, I think page 2 is important because this goes to

11    the impeachment issue.  If you look on the first full

12    paragraph, essentially the second paragraph of page 2 --

13         THE COURT:  OK, that may have been too quickly.

14         MS. BAUMGARTEL:  I think that directly contradicts the

15    detective's testimony here today.

16         THE COURT:  What paragraph?

17         MS. BAUMGARTEL:  It's the second paragraph on the

18    page.  It's the first full paragraph on page 2.

19         THE COURT:  That's attributed to two writers, two

20    people.  I thought that he admitted saying something along

21    those lines but not in as lengthy detail, but then this

22    statement says that in addition the writer did ask these

23    questions.  I don't see how there's a dual attribution, and

24    Fishstein has said he said something along those lines here

25    today.  I don't see what you're getting at.

E2KKCAL3

1          MS. BAUMGARTEL:  Your Honor, if you think it's

2    consistent, then it's not impeachment, but the detective or

3    Agent Floyd's testimony was that Detective Fishstein did most

4    of the questioning, and then when Detective Fishstein testified

5    he essentially said that maybe Floyd said that, I didn't say

6    that.  I just think it would be helpful to have in the

7    record --

8          THE COURT:  I've got to look at the testimony.  If

9    that's what Agent Floyd said, then I guess we may have a

10   problem.  But isn't that enough to show inconsistency, if

11   that's what he said?  Why do we have to call him back?

12         MS. BAUMGARTEL:  Your Honor, I have made an argument

13   and I am not going to hold us here until --

14         THE COURT:  I don't want to deny you of something if I

15   see that --

16         MS. BAUMGARTEL:  If I'm beating a dead horse --

17         THE COURT:  -- if it would benefit your case.  But

18   don't you have the case, if he said that?

19         MS. BAUMGARTEL:  That's fine, your Honor.  I will just

20   argue it.  I will argue it from the prior testimony that we

21   have.

22         May I officially enter the pictures now that the

23   government has agreed to them?

24         THE COURT:  Sure.

25         MS. BAUMGARTEL:  I want to enter a Defendant Exhibit

1  A, B, C and D.  And these are four photographs which are also

2  identified by government Bates numbers 113, 114, 115, and 116.

3  I will provide copies for --

4          MR. COOPER:  The government has no objection.  We have

5  color copies which we can submit to the Court and provide to

6  defense counsel after this so that the Court has the actual

7  color versions of these documents.

8          THE COURT:  Let me just get the numbers.

9          THE DEPUTY CLERK:  Defendant's A, B, C and D.

10          THE COURT:  Defendant's A, B, C and D?

11          MS. BAUMGARTEL:  Yes, A, B, C and D.

12          (Defendant's Exhibits A, B, C and D received in

13  evidence)

14          THE COURT:  All right.  Give a copy to Mr. Monteagudo

15  and we will have a record.

16          MS. BAUMGARTEL:  Thank you.

17          THE COURT:  Everything else all right?

18          MS. BAUMGARTEL:  Yes.

19          MR. COOPER:  Your Honor, before we go off the record,

20  could we set a briefing schedule for posthearing briefs?

21          THE COURT:  You want three -- what, two weeks?

22          MR. COOPER:  Two weeks is fine for the government.

23          MS. BAUMGARTEL:  Two weeks.

24          THE COURT:  Is that all right, Ms. Baumgartel?

25          MS. BAUMGARTEL:  Yes.

1            THE DEPUTY CLERK:  March 6th.

2            THE COURT:  You want to argue after that or just on

3   the papers?

4            MS. BAUMGARTEL:  Probably on the papers will be fine,

5   your Honor, unless you have -- unless your Honor wants to have

6   argument.

7            MR. COOPER:  That's fine for the government, your

8   Honor.

9            THE COURT:  All right.

10                              * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

MARK FISHSTEIN

Direct By Mr. Cooper . . . . . . . . . . . . . .81

Cross By Ms. Baumgartel  . . . . . . . . . . .96

Redirect By Mr. Cooper . . . . . . . . . . . 115

Recross By Ms. Baumgartel  . . . . . . . . . 118

Redirect By Mr. Cooper . . . . . . . . . . . 122

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 A, B, C and D  . . . . . . . . . . . . . . . 135